**RAD SERVICES, INC.**, Appellant

v.

**AETNA CASUALTY AND SURETY COMPANY.**

No. 86–3044.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1986.

Decided Dec. 30, 1986.

Thomas M. Mulroy (argued), Pillar and Mulroy, P.C., Pittsburgh, Pa., for appellant.

Avrum Levicoff (argued), Egler, Anstandig, Garrett & Riley, Pittsburgh, Pa., for appellee.

Before WEIS, MANSMANN, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

This case presents us with an issue of first impression raised but not reached in *Lionti v. Lloyd's Insurance Co.*, 709 F.2d 237 (3d Cir.), *cert. denied*, 464 U.S. 995, 104 S.Ct. 490, 78 L.Ed.2d 685 (1983). Unlike the *Lionti* majority, we must decide the primary question of whether a defendant may introduce as substantive evidence the fact that non-party agents of the plaintiff claimed the Fifth Amendment privilege against compelled self-incrimination in response to questioning regarding their employment and the crucial facts at issue.

The plaintiff, RAD Services, Inc. ("RAD"), sued the defendant, Aetna Casualty & Surety Co. ("Aetna"), to recover under its insurance policy costs incurred in disposing of hazardous waste material. Aetna disavowed coverage since RAD (in the terms of the policy's exclusions) allegedly unlawfully "expected" and "intended" to dump the material. At trial, Aetna read to the jury deposition transcripts of two witnesses—a RAD official and a managing employee—in which the deponents invoked their Fifth Amendment rights. The district court instructed the jury that it could, but need not, infer that the witnesses would have answered Aetna's questions adversely to RAD. The jury found for Aetna.

We hold that the trial court did not err in admitting as evidence the depositions of the non-party witnesses who exercised their Fifth Amendment privileges, nor in permitting the jury to draw adverse inferences therefrom. We, therefore, will affirm the district court's judgment.

### I.

### A.

In 1975 RAD began toxic waste management operations through its TRI division in Baltimore, Maryland. RAD's Board of Directors since 1975 has consisted of its founders—Alden "Dale" Pflug and George Gary—and Art Sciullo, Neil Scholl, and Joseph Sepesy. Pflug headed RAD's TRI unit and, accordingly, understood environmental control laws and regulations.

In the late 1970's, RAD constructed a plant in Bowling Green, Kentucky to produce a zinc sulfate fertilizer additive. The additive contained as its basic raw material a waste product—variously called "electric furnace bag-house dust," "fly ash," or "air pollution control dust"—which accumulated in air pollution control devices of steel mills. Although regulatory authorities had not originally listed the dust as toxic waste, RAD anticipated that state and federal agencies would eventually regulate it and that steel mills would pay for proper disposal of the ash. RAD, therefore, could obtain the material at a negative inventory cost.

Malcolm Crump managed RAD's Bowling Green facilities. By 1980, RAD had accumulated between 2,000 and 3,000 tons of fly ash in a leased warehouse near the plant. In early 1981, however, RAD discontinued production of zinc sulfate fertilizer in the face of a disappearing market. RAD thereupon undertook to sell its plant. Yet, despite contacting some 170 prospective buyers, RAD received only one firm offer which RAD director Sciullo described as "quite low."

In August of 1982, government officials of the State of Kentucky notified RAD that its continued storage of the ash at the

Bowling Green warehouse violated state environmental regulations. Pflug dispatched Elizabeth Morgan, the compliance officer at RAD's TRI unit, to evaluate the Bowling Green plant and warehouse. Morgan's report detailed numerous violations of federal and state law and recommended that RAD immediately remove the dust to avoid civil or criminal penalties.

Pflug requested that the TRI division prepare a plan to dispose of the material. TRI's plan involved shipping the dust under a manifest as federal law required and burying it at a proper site. The $500,000 to $600,000 cost of that program, however, caused RAD's directors to find another plan.

In November of 1982, plant manager Crump received another notice of violation from the State of Kentucky at the Bowling Green plant. Director Sciullo subsequently informed RAD's Board of an arrangement with George Hedrick, a chemical broker. Hedrick had agreed to find a buyer and to arrange transportation for the fly ash. RAD would pay two-thirds and Hedrick one-third of the shipping costs, while Hedrick would retain any sales proceeds. Hedrick located Fritt Industries, Inc. ("Fritt") which agreed to purchase the dust for processing at its plants in Iowa and Arkansas. Fritt, however, would buy the material only if RAD would ship it without a manifest.

Gary asked Pflug to determine whether applicable manifest requirements might except RAD's shipment to another processor. Elizabeth Morgan, however, advised the Board that shipment without a manifest would contravene federal and perhaps state law. Nonetheless, RAD proceeded with the Fritt sale.

Sciullo and Crump oversaw the shipments to Fritt, and RAD remained responsible for the material until Fritt received it. In January of 1983, several truckloads arrived at Fritt's plant in Humboldt, Iowa. Fritt, though, rejected four loads, claiming the ash was too wet for its purposes. Crump instructed the shipper to bring the dust back to the Bowling Green plant. Crump then learned that substantially all of the dust in RAD's warehouse was wet. Fritt tried to process a few loads of the material at its Walnut Ridge, Arkansas facility, but soon refused to accept any more. Under pressure from Sciullo and Frank Sullivan, a RAD employee, Hedrick arranged with Don Draper of Alley-Cassetty Trucking Co. ("Alley-Cassetty") to dump the dust into a strip mine near Morgantown, Kentucky.

Sciullo agreed to pay Hedrick $60,000 in two installments for the dumping. Crump supervised the loading of the material and prepared bills of lading as if Alley-Cassetty were hauling the ash to Walnut Ridge, Arkansas. The shipments commenced in February, 1983. The following March, officials from the State of Tennessee caught Alley-Cassetty dumping the dust on a farm in Rutherford County, Tennessee. The State of Kentucky soon joined in commencing proceedings against RAD, Hedrick, Alley-Cassetty, and others for violating state environmental protection laws.

Faced with a fine of $10,000 per day while the dust remained in the strip mine, RAD's directors arranged to dispose properly of the material. RAD then filed a claim with Aena for the cost of the cleanup, citing its "comprehensive general liability insurance" policy insuring RAD for, *inter alia,*

> bodily injury or property damage arising out of the [*sudden and accidental*] discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water[.]

(Emphasis added.) Aetna, however, denied coverage under a policy exclusion providing that insured occurrences could be *"neither expected nor intended* from the standpoint of the insured[.]" (Emphasis added.) RAD thereupon brought this action in the district court.

### B.

In order to defeat RAD's claim that the occurrence was "neither expected or in-

tended," Aetna sought at trial to show that agents of RAD had planned the dumping. In addition to other circumstantial evidence, Aetna offered the depositions of Pflug and Crump, wherein both witnesses invoked their Fifth Amendment privileges and refused to answer questions concerning either their involvement with RAD or their present employment status with RAD. The district court instructed the jury that it could, but need not, infer that the witnesses would have testified adversely to RAD. The jury found for Aetna, and this appeal followed.

## II.

### A.

The plaintiff presses two related issues on appeal. First, RAD contends that the district court erred in admitting as evidence against it the depositions of Pflug and Crump, in which they refused to answer Aetna's questions and invoked the Fifth Amendment, since the depositions were irrelevant as an evidentiary matter and were highly prejudicial. Second, the plaintiff insists that the trial court compounded its error by permitting the jury to draw adverse inferences from the deponents' Fifth Amendment invocations.

### B.

Because the admissibility against a party of a non-party's exercise of the Fifth Amendment privilege initially "implicates the interpretation and application of legal precepts ..." we possess plenary review on that issue. *United States v. Fishbach and Moore, Inc.*, 750 F.2d 1183, 1193 (3d Cir. 1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). We review by an abuse of discretion standard, however, the plaintiff's argument that the district court should have excluded Pflug's and Crump's depositions pursuant to Fed.R. Evid. 403.[1] *Fischbach and Moore, Inc.*,

750 F.2d at 1193; *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). Assuming the admissibility of that evidence, we may reverse the trial judge "only if [his] instruction was capable of confusing and thereby misleading the jury." *Fischbach and Moore, Inc.*, 750 F.2d at 1195, *citing Idzojtic v. Pennsylvania Railway Co.*, 431 F.2d 1029, 1036 (3d Cir.1970) (Aldisert, J., dissenting).

## III.

### A.

#### 1.

■ Initially, we recall that the privilege against compelled self-incrimination operates differently in civil and criminal proceedings. In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, *reh'g denied*, 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965), the Supreme Court announced the now familiar principle that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615, 85 S.Ct. at 1233. Nonetheless, the Court ruled in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Id.* at 318, 96 S.Ct. at 1558. *See United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 55–56, 68 L.Ed. 221 (1923).

This distinction derives from the desire for fact which impels the adversary process, and from the concomitant doctrine that privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public

---

1. Fed.R.Evid. 403 reads:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980), *quoting Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting). The aims supporting the privilege [2] simply apply less forcefully in civil than in criminal cases. A non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree. *See Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 521 (8th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). At least, then, to the extent that the policies underlying the privilege permit the trier of fact to know when a *party* has invoked it, we find that they likewise allow evidence of a *non-party's* refusal to testify under the facts here present.

More particularly, nothing forbids imputing to a corporation the silence of its personnel. On the one hand, Fed.R.Evid. 801(d)(2)(D) excepts from the hearsay rule a statement offered against a corporate party and made by its "agent or servant concerning a matter within the scope of his agency or employment ... during the existence of the relationship...." The bases for admitting these vicarious admissions against the corporation also justify informing the factfinder when the corporation's agent invokes the Fifth Amendment privilege.

An employee's self-interest would counsel him to exculpate his employer, if possible. The witness, as well, would know the facts about which he is called to testify since they relate to the scope of his employment. The employer, moreover, could rebut any adverse inference that might attend the employee's silence, by producing

contrary testimonial or documentary evidence. *See* Heidt, *supra* note 2, at 1120–21; Fed.R.Evid. 806.

### 2.

On the other hand, the mere fact that the witness no longer works for the corporate party should not preclude as evidence his invocation of the Fifth Amendment. Although the record is unclear regarding whether Pflug and Crump were still employed with RAD at the time of their depositions because they invoked the Fifth Amendment as to these questions, subsequent questions put to them pertained solely to events occurring while they worked for RAD.

RAD relies upon a student note criticizing Professor Heidt's article to argue that the district court improperly admitted the depositions of Pflug and Crump. Note, *Adverse Inferences Based on Non-Party Invocations: The Real Magic Trick in Fifth Amendment Civil Cases,* 60 Notre Dame L.Rev. 370 (1985). The Note author suggests that "[o]nce the employment relationship is severed, there is little justification for allowing adverse inferences," particularly "if the employee was fired or departed on unfriendly terms." *Id.* at 386. Because, according to RAD, Aetna failed to demonstrate continuing loyalty on the part of Pflug or Crump toward RAD, the court erred in allowing the jury to attribute their claims of privilege to RAD.

Concededly, Pflug and Crump asserted the Fifth Amendment in response to questions concerning their employment status with RAD. Thus, we lack record evidence to determine whether their depositions might come under the penumbra of Rule 801(d)(2)(D). As Heidt observes, however:

> That the invoker is no longer the defendant's employee at the time of his invok-

---

**2.** Four aims in particular support the Fifth Amendment privilege: (1) to discourage inhumane treatment and abuses by the government; (2) to maintain the appropriate state-individual balance of advantages; (3) to avoid subjecting persons to the cruel trilemma of self-accusations, perjury, or contempt; and (4) to protect the private enclave. Heidt, *The Conjurer's Cir-*

*cle—The Fifth Amendment Privilege in Civil Cases,* 91 Yale L.J. 1062, 1083 n. 87 (1982), *citing* Friendly, *The Fifth Amendment Tomorrow: The Case for Constitutional Change,* 37 U.Cin.L.Rev. 671, 686–87 (1968). *See Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

ings need not necessarily bar admitting the invokings as a vicarious admission. The fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable. Any factors suggesting that a former employee retains some loyalty to his former employer—such as the fact that the employer is paying for his attorney—would serve the same purpose.

Heidt, *supra* note 2, at 1119 n. 214. *See Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983).

RAD counters that an ex-employee might seek to discredit his former employer. The absence of an opportunity to cross-examine the invoker and the lack of proof regarding his continuing loyalty to the employer, RAD insists, renders the claim of privilege inadmissible. Yet these factors cannot *per se* exclude from the jury the witness's refusal to testify.

First, a witness truly bent on incriminating his former employer would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom. Fourth, a rule precluding evidence of a former employee's invocation would allow a corporate party like RAD to stymie the discovery process with expedience by discharging those potentially responsible for the alleged wrongdoing. Nothing, in short, favors keeping a former agent's claim of privilege from the jury.

### 3.

Two other United States Courts of Appeals have addressed the present legal issue. *See Brink's Inc. v. City of New York*, 717 F.2d at 700; *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d at 509. *See also E.H. Boerth v. LAD Properties*, 82 F.R.D. 635, 644–45 (D.Minn.1979) (refusing to grant the individual defendant's motion for a new trial where the court permitted the plaintiff to introduce at trial the deposition of the assistant vice-president of the corporate defendant, in which the deponent invoked the Fifth Amendment in response to relevant questions concerning financial shortages occurring during his employment).

In *Brink's Inc.*, Brink's contracted with New York City to collect coins from city parking meters. Several Brink's employees were subsequently convicted of stealing parking meter revenues. The City thereupon canceled the Brink's contract. Brink's sued for damages, and the City counterclaimed averring breach of contract and negligence. Brink's then filed a third-party complaint against twelve of its present and former employees and their supervisor. The district court denied a preliminary motion by Brink's to preclude the City from questioning the third-party defendants concerning matters regarding which they might invoke the Fifth Amendment. 717 F.2d at 702. At trial, the third-party defendants declined to answer the City's questions. The trial judge allowed the jury to draw adverse inferences from the witnesses' silence. *Id.* at 707. The jury awarded the City substantial compensatory and punitive damages. *Id.* at 702. The Court of Appeals for the Second Circuit affirmed the district court's judgments. *Id.* at 715.

Similarly, in *Rosebud Sioux Tribe*, the Tribe sued the defendant for damages arising out of a contract to develop an irrigation system. The defendant counterclaimed. Before trial, the plaintiff—in an attempt to prove collusion and a conspiracy to defraud the Tribe among the defendant, an attorney, the deponent, and others—deposed Richard Lone Dog who chaired the corporation which administered the Tribe's lands. Lone Dog's deposition contradicted the plaintiff's complaint. He then informed the Tribe that he would invoke the Fifth Amendment and refuse to testify at trial. The court refused to permit the

Tribe to call Lone Dog as a witness solely to have him take the Fifth Amendment before the jury. The judge, however, allowed either side to read Lone Dog's deposition into evidence; the defendant, of course, did so over the plaintiff's objection. 733 F.2d at 514. The jury returned a verdict for the defendant on its counterclaim. *Id.* at 511. The Court of Appeals for the Eighth Circuit reversed and remanded the case for a new trial. It held, *inter alia,* that the district judge should have permitted the plaintiff to call the deponent despite his stated intent to remain silent. *Id.* at 520.

We agree with the fundamental holding in these cases that the admission as evidence of a non-party's invocation of the Fifth Amendment privilege is not *per se* reversible error.

### 4.

■ Furthermore, we find nothing in the trial judge's charge which might have confused or misled the jury. The district court admonished the jury in a straightforward manner:

> During the trial you also heard evidence by past or present employees of the plaintiff refusing to answer certain questions on the grounds that it may tend to incriminate them. A witness has a constitutional right to decline to answer on the grounds that it may tend to incriminate him. You may, but you need not, infer by such refusal that the answers would have been adverse to the plaintiff's interests.

That instruction contained no error.

### B.

RAD argues, however, that the admission of the Pflug and Crump depositions here violated Fed.R.Evid. 403. RAD claims that the district court "allowed the assertion of the Fifth Amendment privilege to constitute evidence when there was no other evidence that [Pflug or Crump] had any knowledge of the plan to intentionally dump the material." We disagree.

The record is replete with circumstantial evidence of Pflug's and Crump's involvement with the alleged plan to dump the fly ash. Pflug was not only an officer and director of RAD but also, according to the testimony of Directors Gary and Sciullo, figured prominently in deciding whether to ship the dust without a manifest. TRI officer Elizabeth Morgan likewise testified that Pflug shunned TRI's program to dispose lawfully of the dust, and told her that RAD's Board would "take care of it." Morgan observed that Pflug did not want to discuss the clean-up further and "almost looked embarrassed by it."

Crump managed the Bowling Green facility where the dust originated. He supervised the loading of the ash and prepared bills of lading showing an Arkansas destination. Crump also was responsible for seeing that the dust reached Fritt. George Hedrick testified, however, that Alley-Cassetty moved ten loads per day in just four trucks; the warehouse employees clearly could have observed that the truck drivers' true destination was geographically closer to Bowling Green than Walnut Ridge, Arkansas. Finally, Aetna's counsel confronted George Gary with his notes indicating that RAD shipped 1,808.68 tons of ash to Walnut Ridge in mid-February of 1983. Yet the notes showed that Fritt never received it. Gary confessed that Crump "must have" provided him with that information.

Under these circumstances, the jury reasonably could have inferred from their refusals to testify that Pflug and Crump, as agents of RAD, participated in the alleged dumping scheme.

We recognize, of course, the need to guard against "sharp practices" which some might twist our holding to invite. *See Brink's Inc.,* 717 F.2d at 715 (Winter, J., dissenting). The trial judge maintains discretion under Fed.R.Evid. 403 to control the way in which non-party claims of privilege reach the jury. Judge Winter's dissent in *Brink's Inc.* rightly decries "the systematic interrogation of witnesses on direct examination by counsel who knows

they will assert the privilege against self-incrimination," *id.*, and properly disapproves of fact-specific questions by which the examining attorney effectively testifies for the invoking witness. *See id.* at 716.

We find, however, that the district court here did not abuse its discretion in permitting Aetna to read Pflug's and Crump's depositions to the jury. The depositions contained exchanges between counsel regarding the bases for the witnesses' refusals to testify and broad questions by Aetna to test the extent of the privilege claimed. Nothing in the record indicates that Aetna intended adverse inferences or by its questioning took unfair advantage of RAD's inability to cross-examine Pflug and Crump.

### C.

■ RAD further argues that the district court should not have admitted Pflug's and Crump's depositions in light of the alleged fact that the Department of Justice abused the discovery process in this case by trading information with Aetna. RAD attempts to support its point by noting that the Supreme Court in *Baxter v. Palmigiano*, 425 U.S. at 308, 96 S.Ct. at 1553, permitted an adverse inference against a civil litigant who refused to testify on he basis that in civil suits "no party brings to the battle the awesome powers of the government...." *Id.* at 335. Nonetheless, we find nothing here to render the witnesses' claims of privilege inadmissible.

The record evinces that RAD and several of its past and present employees were subjects of federal grand jury investigations in Kentucky and Tennessee regarding the alleged unlawful dumping of fly ash. John West, a special agent for the Environmental Protection Agency, provided Aetna with information which led Aetna to deny coverage initially under its insurance policy with RAD. RAD filed its complaint in December of 1984 and, over the ensuing eight months, counsel for Aetna conversed only twice with West by telephone. On those occasions, counsel for Aetna agreed to furnish certain deposition transcripts to West. When Aetna informed RAD of this agreement, however, counsel agreed that Aetna should not disclose discovery materials to West pending a decision by RAD as to whether it would proceed further with its lawsuit.

RAD then notified Aetna that it would depose chemical broker James Hedrick at the federal prison camp at Terre Haute, Indiana, where he was incarcerated. At the deposition, RAD's counsel was informed by Hedrick that he would not testify until indictments issued from the Tennessee and Kentucky grand juries. Hedrick apparently took that position on the advice of his counsel and at the request of Special Agent West and of the Department of Justice. Evidence also exists in Hedrick's deposition that pursuant to a plea agreement federal authorities recommended the minimum sentence for Hedrick in exchange for his truthful testimony.

On June 8, 1985, Aetna sought to depose Pflug who then invoked the Fifth Amendment. One week later, RAD filed a motion for a protective order to prohibit Aetna from disclosing discovery materials to the Department of Justice, to preclude Aetna from inquiring specifically into the knowledge of past and present RAD agents about technical requirements concerning the storage or shipment of fly ash, and to strike on relevancy grounds all references to such knowledge from the depositions of RAD directors Sciullo and Gary.

Following Aetna's answer and after a hearing on RAD's motion, the district court issued an order sealing all depositions in the case, ordering exclusive possession of those transcripts with the parties, and extending discovery to allow RAD to depose Hedrick. On July 1, 1985, Aetna deposed Crump. Furthermore, Aetna deposed Hedrick after RAD apparently decided not to examine him.

Several conclusions arise from these historical facts. Initially, Aetna's motion for a protective order and its present argument are directed primarily to an alleged government influence on the testimony of George

Hedrick. We find nothing which might taint the depositions of Pflug and Crump. In fact, counsel agreed that Aetna, before Aetna deposed Pflug, should not disclose its depositions to the government pending RAD's decision whether or not to continue this case. The district court, additionally, entered its protective order before Aetna deposed Crump. Thus, both Pflug and Crump were insulated from any alleged governmental excesses.

Finally, it is instructive to recall that RAD elected to bring this action against Aetna while federal grand juries were investigating present and former RAD officials and employees. RAD well knew when it filed suit that Aetna's denial of coverage under the insurance policy on the ground that RAD intentionally dumped the dust would occasion discovery into the same core of operative facts involved in the grand jury probes. Inasmuch as the decision to proceed with this case rested with RAD, it would be improper to stymie Aetna's defense by keeping Pflug's and Crump's relevant claims of privilege from the jury.[3]

## IV.

■ Finally RAD insists that we faced a case factually analogous to that here in *Lionti*. Although RAD concedes that the majority did not decide whether evidential value inheres in a non-party witness's Fifth Amendment invocation in a civil case, RAD relies heavily on the dissent which answered the issue negatively and specifically dis-

approved of the result in *Brink's Inc. See Lionti*, 709 F.2d at 245 n. 4.[4]

In *Lionti*, the plaintiff asserted losses of some $464,712 against Lloyd's, Inc. ("Lloyd's) when a violent explosion and fire destroyed his restaurant and bar. Lloyd's refused coverage on the ground that the fire had been set intentionally, and counterclaimed for $180,000 which it had paid Lionti's mortgagee. At trial, the defendant introduced overwhelming evidence of arson including gasoline containers and an electric charcoal lighter recovered from the debris. Compelling proof also linked Lionti himself to the arson. The restaurant was nearly bankrupt at the time of the fire. Nine days previously, in fact, Lionti's mortgagee had notified him that it intended to foreclose on its security interests and that the building would be sold immediately. Moreover, the plaintiff had, just days before the fire, uncharacteristically prepaid three months' insurance premiums and had sought unsuccessfully to purchase an additional $500,000 in fire insurance. Lionti, in his case, attempted to show an absence of motive and suggested, *inter alia*, that a vengeful employee, Brice McLane, set the fire. *Lionti*, 709 F.2d at 239–40.

During the trial, Lloyd's called McLane to testify. In response to questions concerning whether he had anything to do with setting the fire, however, McLane repeatedly asserted his Fifth Amendment privilege. The trial judge then permitted Lloyd's to call its investigator, William Miller, who testified before the jury that McLane had previously denied involvement in the fire. Miller further stated that mem-

---

3. In unique cases like the present, wherein the person from whom information is sought in a civil proceeding may face criminal prosecution, district courts have the discretion to stay civil discovery in part until the criminal trial has concluded.

We have in the past upheld the exercise of discretion to stay civil proceedings pending ongoing criminal litigation. *See, e.g., Texaco, Inc. v. Borda*, 383 F.2d 607 (3d Cir.1967) (sustaining a stay of a private antitrust suit pending the resolution of criminal proceedings against several of the petitioner's alleged co-conspirators). *But cf. DeVita v. Sills*, 422 F.2d 1172 (3d Cir. 1970) (affirming a district court's refusal to grant a preliminary injunction to restrain a state judicial inquiry concerning possible disbarment of a judge, despite a pending criminal indictment charging essentially the same misconduct as the civil order). *See generally* Heidt, *supra* note 2, at 1132–34 & nn. 256–61 (discussing remedies available to civil litigants seeking discovery in the face of pending criminal prosecutions).

4. *Brink's Inc.* had yet to reach the Court of Appeals for the Second Circuit when we decided *Lionti*. Thus, the dissent cited to the district court opinion. *See Brink's Inc. v. City of New York*, 539 F.Supp. 1139 (S.D.N.Y.1982).

bers of the Lionti family had, according to McLane, approached him concerning "how someone could set a fire." *Id.* at 241. The court ordered that statement stricken and told the jury to disregard it. Miller finally related, over Lionti's objection, that McLane had claimed to possess information which would "wrap the case up for the insurance company and [that] the Liontis were not dumb and they would be willing to make a deal." *Id.* at 242.

Following Miller's testimony and again in its charge, the court instructed the jury that it could use Miller's testimony solely to impeach McLane's credibility. The court also charged the jury that McLane's claim of the Fifth Amendment privilege should "have no evidentiary value at all." *Id.* The jury returned a verdict for Lloyd's. Lionti sought a new trial on appeal, asserting error in the improper statements of Miller.

We inquired into whether Miller's testimony was so prejudicial as to mandate a new trial. We concluded that it was not error to admit Miller's testimony regarding McLane's desire to sell his testimony, since that desire reflected upon his credibility before the jury. We determined, however, that:

> [T]o the extent that the district court removed from the jury's consideration McLane's claim of privilege, Miller's testimony as to what McLane had told him—that McLane "did not have anything to do with setting the fire"—was hearsay.

*Id.* at 243. Nonetheless, we held that "[i]n light ... of the overwhelming evidence adduced during trial, we are satisfied that Miller's statement, while erroneously admitted, was harmless." *See* Fed.R.Evid. 103(a).

*Lionti* raises two obvious answers to RAD's appeal. On the one hand, inasmuch as our decision there rested entirely upon the basis of harmless error, *Lionti* in no way supports RAD's contention that the district court erroneously allowed the jury to assign evidential value to Pflug's and Crump's claims of Fifth Amendment privi-

lege. In fact, we expressly noted our refusal to reach the issue in *Lionti*, 709 F.2d at 243 n. 10.

On the other hand, the result in *Lionti* provides an alternative ground for our decision to affirm the district court here. We have recounted at some length the wealth of evidence, other than the depositions of Pflug and Crump, which Aetna proffered to support its position at trial. As we observed in *Hahn v. Atlantic Richfield Co.*, 625 F.2d 1095 (3d Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981),

> [a] jury verdict carries with it the benefit of all reasonable inferences capable of being drawn therefrom, and an appellate court is bound to interpret the evidence in the light most favorable to the verdict winner. [Citations omitted.] Any fact that the jury could have reasonably inferred from the evidence in favor of the verdict winner will be presumed to have been so inferred when the court reviews the record supporting the verdict.

*Id.* at 1099. Our recitation of the facts incorporates the *Hahn* standard.

We have similarly remarked upon the fact that Aetna neither took unfair advantage of RAD's inability to cross-examine Pflug and Crump nor in any other way occasioned undue prejudice in this case. Thus, even assuming *arguendo* that the district court improperly admitted the depositions into evidence, we hold that the error would as in *Lionti* be harmless. *See Lionti*, 709 F.2d at 243; *Mercer v. Theriot*, 377 U.S. 152, 154, 84 S.Ct. 1157, 1159, 12 L.Ed.2d 206 (per curiam), *reh'g denied*, 377 U.S. 973, 84 S.Ct. 1643, 12 L.Ed.2d 743 (1964). *See also* Fed.R.Civ.P. 61 (providing that errors in the admission of evidence are not grounds for ordering a new trial or otherwise for disturbing a judgment unless the refusal to do so would offend "substantial justice").

## V.

In sum, we hold that the district court properly admitted the Fifth Amendment invocations of the non-party witnesses under

the circumstances here and did not err in permitting the jury to draw adverse inferences from those refusals to testify. We hold alternatively that any error in admitting the depositions of Pflug and Crump is harmless in light of the record here and is, therefore, insufficient to warrant a new trial. The judgment of the district court will be affirmed.