**Jane ROE, et al.**

v.

**OPERATION RESCUE, et al.**

**Civ. A. No. 88–5157.**

United States District Court,
E.D. Pennsylvania.

Dec. 29, 1989.

Mary A. McLaughlin, Linda J. Wharton, Dechert Price & Rhoads, Lori Lowenthal Stern, Philadelphia, Pa., for plaintiffs.

William A. Bonner, The Rutherford Institute of Pa., Media, Pa., for Operation Rescue; Randall Terry.

Joseph F. Wusinich, III, Wusinich and Brogan, West Chester, Pa., for Michael McMonagle.

Joseph F. Wusinich, III, for Operation Rescue/Randall Terry, Joseph Foreman.

Patricia Walton, in pro. per.

Mark L. Tunnel, West Chester, Pa., for Randall Terry and Operation Rescue.

### MEMORANDUM

NEWCOMER, District Judge.

Presently before the court is plaintiffs' motion for civil contempt. After a hearing on the matter held on December 18, 1989, the motion is now ripe for adjudication.

### I. *PROCEDURAL BACKGROUND*

Because the procedural background of this case has been set forth in numerous previous memoranda of this court, it will not be repeated in detail here. For present purposes, it is sufficient to note that plaintiffs filed this action on June 29, 1988,

seeking declaratory and injunctive relief addressed to the health and safety of women seeking abortions or other family planning services in the metropolitan Philadelphia area. After a hearing on June 30, 1988, this court granted plaintiffs' motion for a temporary restraining order. On September 22, 1988, the court granted plaintiffs' motion for a preliminary injunction pursuant to a temporary consent decree agreed to by the parties. After another hearing on November 15–16, 1988, and pursuant to an agreement between the parties, the court issued an order that provided for the preliminary injunction to remain in effect until such time as a hearing on permanent injunctive relief was held. After the November hearing and in a Memorandum and Order dated December 5, 1988, defendants Randall Terry, Michael McMonagle, Joseph Foreman, Operation Rescue, and nondefendant Tina Krail were found in civil contempt for violating the temporary restraining order of June 30, 1988. On March 21, 1989, the court granted in part plaintiffs' motion for summary judgment and issued a permanent injunction.

The pertinent provisions of each of the aforementioned injunctions read as follows:

Defendants, the officers, directors, agents and representatives of defendants, and all other persons acting in concert with them are enjoined and restrained in any manner or by any means from:

(a) trespassing on, blocking, obstructing ingress or egress from any facility at which abortions are performed in the City of Philadelphia or metropolitan area (including the City of Allentown, Pennsylvania, and Cherry Hill, New Jersey) and,

(b) physically abusing or tortiously harassing persons entering, leaving, working at, or using any services at any facility at which abortions are performed in the City of Philadelphia and metropolitan area (including the City of Allentown, Pennsylvania, and Cherry Hill, New Jersey) provided that: (i) "sidewalk counseling", consisting of reasonably quiet conversation of a non-threatening nature conducted by not more than two people for each person they are seeking to counsel, shall not be prohibited; (ii) no one is required to accept or listen to "sidewalk counseling" and should anyone decline such counseling, that person shall have the absolute right to leave or walk away without harassment; (iii) "sidewalk counseling" as defined here shall not limit the right of the Police Department and/or the United States Marshal to maintain public order by reasonably necessary rules and regulations as they decide are necessary at any particular demonstration site.

## II. CIVIL CONTEMPT—LEGAL STANDARD

■ Civil contempt is remedial in nature and its purpose is to benefit the complainant. *Latrobe Steel Co. v. United Steelworkers of America*, 545 F.2d 1336, 1343 (3rd Cir.1976); *CBS Inc. v. Pennsylvania Record Outlet, Inc.*, 598 F.Supp. 1549, 1557 (W.D.Pa.1984). Civil contempt proceedings are instituted primarily on motion of the plaintiff and are part of the underlying action. *Latrobe*, 545 F.2d at 1343–44.

■ Courts use civil contempt both to compensate losses or damages sustained by reason of noncompliance with a court order and to coerce future compliance. *McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 87 (3rd Cir.1984); *CBS Inc.*, 598 F.Supp. at 1557; *Calvin Klein Co. v. Fashion Indus. Inc.*, 221 U.S.P.Q. 81, 83 (D.N.J.1982). Thus, the broad category of civil contempt consists of compensatory or remedial actions which seek to compensate the complainant for damages caused by past acts of disobedience, and coercive actions which are designed to aid the complainant by bringing the defiant party into compliance with the court's order. *Latrobe*, 545 F.2d at 1344.

■ To establish civil contempt, a plaintiff must prove the following elements by clear and convincing evidence: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order. *Calvin Klein Co.*, at 83. A person

is liable for civil contempt if he violates a court order with actual notice that the order has been issued. *Quinter v. Volkswagen of America,* 676 F.2d 969, 973 (3rd Cir.1982). It is not necessary, however, that the person be formally served with the order or that the violation be willful or intentional. *Id.*

None of the parties has challenged the validity or the existence of the applicable injunctions or restraining orders. Thus, the following discussion focuses on the remaining two elements necessary to establish civil contempt.

### III. *DISCUSSION*

In the instant motion, plaintiffs allege six violations of Orders of this court for which they seek to hold defendants Michael McMonagle and Operation Rescue in civil contempt. The court heard testimony relating to the following occurrences (by date, location, and alleged contemnor): (1) October 29, 1988, Northeast Women's Center (NEWC) and Elizabeth Blackwell Health Center (EBHC) (Operation Rescue); (2) January 21, 1989, Reproductive Health and Counseling Center (RHCC) (McMonagle); (3) February 8, 1989, Women's Suburban Clinic (WSC) (McMonagle); (4) March 24, 1989, EBHC and Planned Parenthood (PP) (Operation Rescue); (5) April 29, 1989, Cherry Hill Women's Center (CHWC) (Operation Rescue); and (6) June 10, 1989, NEWC (Operation Rescue).

### A. *Defendant McMonagle's Absence from the Hearing*

Although he was represented by counsel, defendant McMonagle was not present at the hearing on plaintiffs' contempt motion.

The contempt motion was filed July 7, 1989, and in an Order dated November 2, 1989, the hearing was scheduled for November 20, 1989. During a phone conference with counsel on November 17, 1989, the court continued the hearing until December 13, 1989, for the express purpose of defense counsel arranging McMonagle's presence at the hearing.[1] *See* Order dated October 21, 1989.[2] Subsequently, the hearing was continued until December 18, 1989. In light of the ample notice and opportunity given to McMonagle to attend and defend himself at the contempt hearing, the court concluded that the requirements of due process had been satisfied, that McMonagle had waived his right to be present, and that it was appropriate to proceed with the hearing. *See, e.g., Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) ("the hearing required by due process is subject to waiver").[3]

### B. *Rulings on Exhibits*

■ At the contempt hearing, the court tentatively admitted the following plaintiffs' exhibits: P-9 (Deposition of Randall Terry); P-10 (Deposition of Michael McMonagle); and P-11 (Deposition of Joseph Foreman). Having now considered the matter and so that the record will be clear, the court will admit those exhibits under Fed.R.Evid. 801(d)(2)(A) (party's own statement in an individual or representative capacity). As suggested by plaintiffs at the hearing, the court may (but is not required to) draw an adverse inference from an individual's invocation of the fifth amendment in a civil action. *See, e.g., RAD Services, Inc. v. Aetna Casualty and Surety Company,* 808 F.2d 271, 275 (3d Cir.1986). During depositions, these individuals in-

---

**1.** At that time and at present, McMonagle was and is incarcerated in a Georgia state prison on charges stemming from abortion protest activities there.

**2.** This Order was misdated and should have been dated *November* rather than October.

**3.** Defendant Randall Terry is the leader of the Operation Rescue organization. Like Michael McMonagle, Terry is presently incarcerated in a Georgia state prison on charges stemming from abortion protest activities there. The court is

satisfied that other individuals could have appeared on behalf of Operation Rescue at the contempt hearing, *see* Plaintiffs' Exhibit P-23, at ¶ 7.c (affidavit of Randall Terry stating that Operation Rescue has several employees), and the court concludes that Terry's presence was unnecessary for adjudication of the motion against Operation Rescue, essentially for the reasons stated in Plaintiffs' Brief as Requested in Court's Order dated November 21, 1989, at 3–8. Operation Rescue was represented by counsel at the hearing.

voked the fifth amendment when asked questions about the various violations in which Operation Rescue allegedly was involved.

## C. *Alleged Violations of Court Orders*

### 1. October 29, 1988

█ Diane Straus, Regional Director of a corporation that owns NEWC and CHWC, testified that 75–125 demonstrators blocked the doorway at NEWC for approximately one hour. A United States Marshal read the injunction, and the demonstrators left. Straus saw two demonstrators wearing red arm bands; at first, she testified that she was unable to tell if there was any writing on the arm bands, but later she stated that one of the arm bands had the word "rescue" on it. According to Straus, as a result of the blockade, only ten of the twenty-eight scheduled abortions were performed that day.

Jean Hunt, Executive Director of EBHC, testified that 10–20 demonstrators arrived at EBHC at 8:00 a.m., and although she and another employee attempted to maintain access to the clinic, the demonstrators succeeded in blocking the entrance. At 10:30 a.m., police arrived and Hunt stated that the police arrested 137 demonstrators. Hunt also testified that as a result of the blockade, none of the twenty-five abortions scheduled that day were performed.

### 2. January 21, 1989

Jane Green, Executive Director of RHCC, testified that 100–125 demonstrators arrived on the grounds of RHCC at approximately 7:00 a.m. and blocked all ingress and egress from the clinic, including the fire exit. She recognized Michael McMonagle, who was standing on the top step of the clinic; she stated that he was holding an amplifier and giving instructions to others about where to stand or move. Green was unable to enter the building for four or five hours, because of the blockade of doorways by the demonstrators. Patients were similarly unable to enter the building until the demonstrators moved or were arrested, and of the twenty-eight scheduled abortions, only twelve were performed. Five demonstrators used bicycle locks to lock themselves to the clinic doors, and local police had to bring Michael McMonagle back to the clinic (after his arrest) because he had the keys to the locks.[4]

### 3. February 8, 1989

Jane Detwiler, Assistant Administrator of WSC, testified that 10–20 demonstrators and an automobile were blocking the front (and sole) entrance to WSC when she arrived. Later, the number of demonstrators grew to approximately 100. She saw Michael McMonagle holding a megaphone and standing in front of the doorway near the automobile that was blocking the doorway. As a result of the blockade, only eight of the twenty-nine scheduled abortions were performed. The blockade was cleared at approximately 2:30 p.m., after local police completed arrests of the demonstrators.[5]

### 4. March 24, 1989

Jean Hunt, Executive Director of EBHC, testified that approximately 100 demonstrators arrived at EBHC at 7:15 a.m. and

---

**4.** In connection with this incident, the court admitted into evidence the following documents: P–1 (verified copy of a police citation issued to Michael J. McMonagle for defiant trespass at RHCC on January 21, 1989); and P–2 (a copy of a notarized "Stipulation and Waiver of Rights" of McMonagle in which he states that he entered and refused to leave RHCC property on January 21, 1989). The court has considered these documents as bearing on whether McMonagle was at RHCC on that date, and not for any indication that he may have violated state law.

**5.** In connection with this incident, the court admitted into evidence the following doc-

uments: P–3 (a notarized copy of an arrest report for Michael J. McMonagle at WSC on February 8, 1989); and P–4 (a certified copy of document indicating McMonagle's guilty plea to certain charges stemming from his presence at WSC on February 8, 1989). The court has considered these documents only as bearing on whether McMonagle was at WSC on that date, and not for any indication that he may have violated state law. In any event, neither these documents nor those identified in note 4 are essential to the court's findings in section III.D. of this Memorandum.

blocked the entrance. She stated the injunction was read to the crowd, arrests were made, and the blockade ended at 10:00 a.m. As a result of the blockade, only ten of the twenty-five scheduled abortions were performed. Hunt saw no signs or other indicia of group affiliation at the blockade.

Hunt also testified that each of the demonstrations she testified about was different from those generally occurring at the clinics, in that these demonstrations were much larger and involved blockading of entrances, whereas the regularly occurring demonstrations typically involve a small number of demonstrators who picket, but do not blockade, the clinic.

Carol Wall, Executive Director of PP, testified that 150–160 demonstrators arrived at PP at 7:00 a.m. and succeeded in blockading the entrance, despite the efforts of PP employees to form a human corridor to escort patients into the clinic. Arrests began at noon and were completed by 1:30 p.m. As a result of the blockade, only six of the 25–30 abortions scheduled were performed. Although Wall did not observe any signs indicating group affiliation, Jean Hunt testified that later in the morning, she went over to PP and observed a banner with the word "rescue" on it and also three demonstrators wearing buttons with the word "rescue" on them.

### 5. April 29, 1989

Diane Straus, Regional Director of a corporation that owns NEWC and CHWC, testified that approximately 100–125 demonstrators arrived at CHWC at 7:00 a.m. and totally surrounded Straus and a group of clinic employees who had formed a human corridor in hopes of escorting patients into the clinic. Straus read the injunction to the crowd six times from various locations. Straus saw one sign that had the word "Operation Rescue—Save the Babies" on it; she also testified that one of the demonstrators blocking the doorway had an "Operation Rescue" shirt on; and after the demonstration, she found a two-page document titled "Operation Rescue Psalter—Psalms, Hymns & Prayers" on the wind-

shield of her car. *See* Plaintiffs' Exhibit P-7. The demonstrators were cleared by police at approximately 1:00–2:00 p.m., and of the thirty-six abortions scheduled that day, twenty-two were performed.

Carol Wall testified that thirty demonstrators arrived at PP and blockaded the front and side entrances, and Wall was unable to enter the building. Wall read the injunction to the crowd, the police arrived, and the demonstrators dispersed at 9:30 a.m. As a result of the blockade, only nine of the 25–30 abortions scheduled that day were performed. Wall did not observe any signs indicating group affiliation.

### 6. June 10, 1989

Diane Straus testified that when she arrived at NEWC on this date, approximately 50 demonstrators were sitting and standing in front of the doorways such that she was unable to enter the building. Later, the number of demonstrators grew to approximately 125 in total. She recognized several demonstrators as persons who had demonstrated at clinics on previous occasions. She saw one demonstrator, who appeared to be a leader of the group, wearing a red "Operation Rescue" shirt. At some time, Straus stated that United States Marshals read the injunction to the crowd. As a result of the blockade, only three of thirty-nine abortions scheduled that day were performed.

Straus also testified that each of the demonstrations she testified about was different from those generally occurring at the clinics, because these demonstrations were much larger and also involved blockading of entrances, whereas the regularly occurring demonstrations typically involve a small number of demonstrators who picket, but do not blockade, the clinics.

### D. *Conclusion*

Based on the testimony and documentary evidence presented at the hearing and as set forth above, the court finds that plaintiffs proved by clear and convincing evidence: (1) that valid orders of this court existed; (2) that defendants Michael McMonagle and Operation Rescue had knowledge

of the order; and (3) that the defendant McMonagle disobeyed the court orders on January 21, 1989, and February 8, 1989. With regard to defendant Operation Rescue, the court finds that plaintiffs' evidence was lacking both in the quantity and quality necessary to prove by "clear and convincing evidence" that group's involvement in the protest activities on October 29, 1988, March 24, 1989, April 29, 1989, and June 10, 1989.[6]

## IV. *RELIEF*

In the court's Order dated December 5, 1988, the court imposed and suspended conditional coercive fines upon Michael McMonagle in the amount of $10,000, for past violations of orders of this court. *See* Memorandum dated December 5, 1988, at 7–8 (citing violations occurring on July 5 and 6, 1988). As stated in that Order, future violations by McMonagle would result in the immediate withdrawal of suspension and imposition of those fines plus imposition of a $5,000 fine for each current violation. Accordingly, having found that McMonagle violated orders of this court again on January 21, 1989, and February 8, 1989, the court will withdraw the suspension and will impose the $10,000 in fines (relating to violations occurring on July 5 and 6, 1988), and will also impose fines in the amount of $10,000 for the current violations (i.e., those occurring on January 21, 1989, and February 8, 1989). Such fines will be payable into the Clerk of Court. *See N.Y. State National Organ. for Women v. Terry*, 886 F.2d 1339, 1353–54 (2d Cir.1989).

Plaintiffs have requested an award of reasonable attorneys' fees attributable to the contempt motion. Such fees and expenses may be awarded for the prosecution of a willful civil contempt. *See Ranco Indus. Products Corp. v. Dunlap*, 776

F.2d 1135, 1139 (3d Cir.1985). Therefore, plaintiffs may submit an application for attorneys' fees as set forth in the accompanying Order.[7]

An appropriate Order follows.

## ORDER

AND NOW, this 23rd day of December, 1989, in accordance with the accompanying Memorandum, it is hereby Ordered that:

1. Plaintiffs' motion for civil contempt is GRANTED as against defendant Michael McMonagle; accordingly, the court WITHDRAWS the previous suspension and hereby IMPOSES fines in the amount of $10,000 (relating to violations occurring on July 5 and 6, 1988) and an additional $10,000 ($5,000 each for violations occurring on January 21, 1989, and February 8, 1989), for total fines due and owing of $20,000. Michael McMonagle shall PAY such fines to the Clerk of Court for the United States District Court of the Eastern District of Pennsylvania no later than January 31, 1990. Plaintiffs' motion against McMonagle is DENIED as to the requests for imprisonment and the initiation of criminal contempt proceedings.

2. Plaintiffs' motion for civil contempt is DENIED as against defendant Operation Rescue.

3. Plaintiffs may file an application for attorneys' fees no later than January 10, 1990. Defendant McMonagle's response, if any, shall be filed no later than January 24, 1990. No extension of these deadlines will be granted. The court expects counsel to cooperate with one another regarding reasonable inquiries concerning the application.

4. The motion of defendant "Randall Terry trading as Operation Rescue" to dismiss contempt charges is DENIED as moot. With regard to that portion of the

---

**6.** Although the evidence clearly indicated that disruptive blockades and demonstrations in violation of this court's Orders occurred on these dates, the evidence concerning the planning, organization, and conduct of these activities was insufficient to prove Operation Rescue's involvement.

**7.** In their motion for contempt, plaintiffs also request that the court: (1) imprison Michael McMonagle until such time as he promises not to violate the orders of this court; and (2) initiate criminal contempt proceedings against any contemnors in the future. The court finds neither of these requests appropriate at the present time and therefore denies them.

Terry's motion concerning the wording of the permanent injunction, the court will await plaintiffs' timely response before ruling on that issue.

AND IT IS SO ORDERED.