NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3491
_____

ROBERT M. WALLETT,
                              *Appellant*

v.

PENNSYLVANIA TURNPIKE COMMISSION,
JOSEPH G. BRIMMEIER,
GEORGE M. HATALOWICH
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-10-cv-02092)
District Judge:  Honorable Sylvia H. Rambo
_____

Submitted Under Third Circuit LAR 34.1(a)
May 7, 2013

Before:  SLOVITER, FUENTES, and ROTH, <u>Circuit Judges</u>

(Filed: May 30, 2013)
_____

O P I N I O N
_____

SLOVITER, Circuit Judge.

Robert M. Wallett filed suit under 42 U.S.C. § 1983 and the First Amendment alleging that his former employer, the Pennsylvania Turnpike Commission ("the Commission"), and two of its former executives (collectively, "Defendants") demoted and later fired him because he refused to participate in their pay-to-play and influence peddling schemes. The District Court first dismissed Wallett's supplemental state law claims and then granted Defendants' motion for summary judgment on the First Amendment political patronage discrimination claim. For the reasons that follow, we will affirm.

## I. Background

In 1997, the Commission hired Wallett as Director of Maintenance. He was hired during a Republican administration. Throughout his tenure at the Commission, Wallett served as an at-will employee.

In 2003, newly-elected Democratic Governor Edward Rendell appointed Joseph G. Brimmeier to be the new Chief Executive Officer ("CEO") of the Commission. In May 2003, Brimmeier transferred Wallett from his position as Director of Maintenance to Director of Facilities. As a result of the transfer, Wallett was demoted from a Grade 19 position to a Grade 18 position.

The Facilities Department was part of the Commission's Engineering Department. As Director of Facilities, Wallett led the Department's consultant selection process which was used when there was a need for mechanical, electrical, plumbing, and environmental

services that could not be performed by Commission staff. After a need for outside services was identified, Wallett's staff prepared summaries and recommendations on each contractor who had submitted a letter of interest.

Each contract was then placed on the schedule for discussion at the next meeting of the Technical Review Committee ("TRC"), a committee of Commission employees who provided rankings and recommendations to the Commissioners for all outside engineering contracts. At all relevant times, the TRC consisted of CEO Brimmeier, Chief Operating Officer ("COO") George Hatalowich, the Chief Engineer, an Assistant Chief Engineer, the Manager of Contracts Administration, and an individual appointed by the CEO.

When a Facilities Department-related engineering contract was on the TRC agenda, Wallett would attend the meeting and make a short presentation summarizing the applicants and recommending certain firms for the contract. Wallett attended, on average, four to six TRC meetings each year during his tenure as Director of Facilities. The TRC members ranked each applicant and then recommended an applicant to the Commissioners who were ultimately responsible for awarding the contracts.

In May 2009, Brimmeier decided to eliminate the position of Director of Facilities and terminated Wallett's employment with the Commission. Approximately three months after his termination, Wallett submitted an application for the newly-created position of Manager of Facilities and Energy Management Operations. A panel of Commission employees, including Hatalowich, interviewed Wallett, but the Commissioners ultimately hired another interviewee, John Christensen, for the position.

In October 2010, Wallett filed a complaint pursuant to 28 U.S.C. § 1983 in the United States District Court for the Middle District of Pennsylvania, alleging that the Commission, Brimmeier, and Hatalowich had violated his First Amendment rights. Wallett also brought supplemental state law claims for Termination in Violation of Public Policy and Additional Consideration. After dismissing the state law claims, the District Court granted Defendants' motion for summary judgment on the First Amendment political patronage discrimination claim. Wallett appealed.

## II. Analysis[1]

In urging reversal of the District Court, Wallett argues that Defendants knew of his refusal to participate in their pay-to-play scheme and terminated him based on that knowledge. Wallett further argues that he was wrongfully discharged in violation of Pennsylvania public policy.

### A. Political Patronage Discrimination

According to Wallett, Defendants knew that he refused to participate in their pay-to-play scheme and therefore demoted and later terminated him because of that failure to support them. In *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), the Supreme Court held that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of a motion to dismiss and over its grant of a motion for summary judgment. *See Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013); *Interstate Outdoor Adver., L.P. v. Zoning Bd. of Twp. of Mount Laurel*, 706 F.3d 527, 529 (3d Cir. 2013).

public employees." 497 U.S. at 75. This court has distilled the Supreme Court's political patronage doctrine into a three-part test that a plaintiff must satisfy in order to establish a *prima facie* case of political patronage discrimination.

A plaintiff seeking to prove a political patronage discrimination claim must show that (1) he "was employed at a public agency in a position that does not require political affiliation, (2) [he] was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). "Implicit in the third prong is a requirement that the plaintiff produce sufficient evidence to show the defendant knew of plaintiff's political persuasion." *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002). This "requires proof of both knowledge and causation."[2] *Galli*, 490 F.3d at 275.

The central disputed question in this appeal is whether Defendants knew that, by refusing to participate in their pay-to-play scheme, Wallett did not support their administration.[3] *See Galli*, 290 F.3d at 275 (finding that the knowledge component is

---

[2] We focus here on the knowledge component of the third prong of this court's political patronage discrimination test because that is the only prong that was briefed by the parties. While not expressly conceding that Wallett has satisfied the first two prongs, Defendants make no meaningful argument to the contrary. Therefore, we will assume without deciding that Wallett was employed at a public agency in a position that did not require a political affiliation and that he engaged in constitutionally protected conduct.

[3] The District Court erred to the extent that it required Wallett to show that "Defendants were aware of [his] political views and these views contributed to his termination . . . ." *Wallett v. Pa. Turnpike Comm'n*, No. 10-2092, 2012 WL 3579575, at *7 (M.D. Pa. Aug. 17, 2012). This court has squarely held that "the right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or power." *Galli*,

5

met where defendants know that plaintiff fails "to show public support for its officials and the political party in power"). Wallett theorizes that, as a merit hire of a Republican administration, he was singled out for termination by the new Democratic administration because by not recommending Defendants' favored contractors he did not support their pay-to-play scheme. Even when read in the light most favorable to Wallett, however, the evidence in the record does not support Wallett's assertion that Defendants were aware of his failure to support their alleged pay-to-play scheme.

Wallett presents a series of facts that he claims demonstrate Defendants' awareness of his lack of support for them. First, after he was transferred from Director of Maintenance to Director of Facilities, Wallett recalls that the new Director of Maintenance told him that he should not "'take it personally'" and that management "just wanted someone they could deal with especially on the personnel side." App. at 618.

Second, Wallett refers to statements made by William Poole, a Facilities Department engineer under Wallett's immediate supervision. Poole stated in his affidavit that Orbital, Inc., a frequent Commission contractor, "while meeting minimal qualifications (i.e., licensed engineers, etc.) was the least efficient and most expensive company and had multiple problems." App. at 666. Poole was therefore "shocked" when Orbital was selected by the TRC for another contract even though the Facilities

---

490 F.3d at 272. Notwithstanding the fact that the District Court took an overly narrow view of what is required for knowledge in a political patronage discrimination claim, we will nevertheless affirm the District Court's judgment because Wallett failed to satisfy that requirement even under this court's broader interpretation of knowledge in this context.

Department had apparently given Orbital low rankings in its summary and recommendation. *Id.*

Third, Frank Kempf, Wallett's supervisor in his position as Director of Facilities, testified during his deposition that he was directed by COO Hatalowich to lower Wallett's 2007 to 2008 performance evaluation from outstanding to commendable in two categories. In his deposition, however, Kempf could not recall the specific reason Hatalowich had asked him to lower Wallett's performance rating.

Next, Wallett points to a 2008 incident in which Kempf was charged with reviewing 160 employees in the Engineering Department, including Wallett, and recommending that six be laid off. When Kempf submitted the list, both CEO Brimmeier and Hatalowich asked Kempf why Wallett's name was not on it. Kempf responded that he did not think Wallett should be laid off.

Finally, Wallett argues that his termination and the hiring of Christensen in the newly-created position show that Defendants had knowledge of his refusal to participate in their pay-to-play scheme and chose to replace him with someone more willing to cooperate with them. Wallett supports this assertion by stating that Brimmeier himself "personally recruited" a politically-connected replacement who, despite the fact that he was unqualified for the position, was the only person whose name was ultimately forwarded to the Commissioners for their consideration. Appellant's Br. at 36.

The inferences that may be drawn from the evidence presented by Wallett, even when read in the light most favorable to him, do not sustain the conclusion that Defendants were aware of Wallett's supposed lack of support for them. First, the alleged

7

statement by the new Director of Maintenance to Wallett explaining that Wallett was replaced because Defendants needed someone who would be more cooperative "on the personnel side" is ambiguous at best. Second, the statements by Facilities engineer Poole regarding contracts awarded to Orbital are also ambiguous, especially in light of the fact that Wallett sometimes recommended Orbital for Commission jobs.

Next, Kempf stated that he was ordered to lower Wallett's evaluation rating in two categories from outstanding to commendable and was questioned about why Wallett was not on a list of six Facilities Department employees to be terminated. These statements are most easily explained by Brimmeier and Hatalowich's apparent dislike for Wallett and rather than Wallett's refusal to participate in their schemes. Kempf himself could not remember why Hatolowich[4] ordered him to lower Wallett's evaluation ratings, even though Wallett attributed it to retaliation for his refusal to support Defendants.

Finally, there is nothing in the record regarding the circumstances of Wallett's termination or Christensen's hiring that would bolster Wallett's assertion that Defendants

---

[4] During his deposition, Hatalowich invoked his Fifth Amendment right against self-incrimination and declined to answer any substantive questions. As Wallett notes in his brief, this court has held that a trial court judge "did not err in admitting as evidence the depositions of the non-party witnesses who exercised their Fifth Amendment privileges, nor in permitting the jury to draw adverse inferences therefrom." *RAD Servs., Inc. v. Aetna Cas. and Surety Co.*, 808 F.2d 271, 272 (3d Cir. 1986). This precedent, however, stops far short of requiring the judge in a civil case to instruct the jury to draw an adverse inference from a non-party witness' invocation of the Fifth Amendment. Moreover, even if we were to draw an adverse inference from Hatalowich's refusal to answer questions during his deposition, there would still not be sufficient evidence upon which to reverse the District Court's judgment.

had any knowledge whatsoever that he did not support them.[5]  It is true that Brimmeier spoke to Christensen based on a referral from the then Deputy Secretary of the Pennsylvania Department of General Services and suggested that Christensen apply for the position.  However, the Commissioners made the final decision on whether to hire Christensen, not Brimmeier.  Moreover, Christensen was unquestionably qualified for the position.

Although Wallett's political patronage discrimination claim relies on allegations that he experienced adverse employment actions because of his refusal to go along with the Defendants' pay-to-play scheme, Wallett references only one specific contractor – Orbital, Inc. – whose bids the Defendants allegedly tampered with over Wallett's objection.  Nevertheless, and as mentioned above, Wallett actually recommended Orbital for Commission contracts on various occasions.  Moreover, Wallett never complained or never object to any of the supposed "recommendations" for contractors that came from Defendants.

Even when read in the light most favorable to him, Wallett is unable to point to anything in the record demonstrating that Defendants were aware that he refused to

---

[5] In fact, there is very little evidence in this record indicating that Wallett engaged in any constitutionally protected conduct.  According to Wallett, his constitutionally protected conduct was his failure "to support [Defendants] political fundraising efforts" through their pay-to-play scheme.  Appellant's Br. at 29.  Yet, Wallett himself admits that he "was never told about these obviously politically fixed contracts . . . because of [his] straight arrow reputation for professionalism."  Appellant's Br. at 15 n.16.  Thus, at its core, Wallett is arguing that he failed to support Defendants in schemes as to which he had little to no knowledge himself.  Defendants do not raise the issue of whether Wallett engaged in constitutionally protected conduct here, and we, therefore, do not rely on it in reaching our decision.

cooperate with their alleged pay-to-play scheme. Thus, we will affirm the District Court's order granting summary judgment to Defendants on the political patronage discrimination count of the complaint.

## B. Pennsylvania Public Policy

Wallett also argues that he was wrongfully discharged in violation of Pennsylvania public policy because his termination was caused by Defendants' alleged pay-to-play and influence peddling schemes. The general rule in Pennsylvania is that employment is at-will unless there is a statutory or contractual provision to the contrary. *See Weaver v. Harpster*, 975 A.2d 555, 556 (Pa. 2009). Pennsylvania courts have found an exception to at-will employment and permitted a common law cause of action for wrongful discharge only where the termination has "implicated a clear mandate of public policy." *Id.* at 564; *see also id.* at 569 ("[W]e can only declare the public policy of this Commonwealth where it is 'so obviously for or against public health, safety, morals, or welfare that there is virtual unanimity of opinion in regard to it.'" (quoting *Mamlin v. Genoe*, 17 A.2d 407, 409 (Pa. 1941))).

The District Court dismissed Wallett's public policy claim because it was reluctant to expand a very narrow exception to Pennsylvania's at-will employment doctrine in the absence of any Pennsylvania case law on point. *See Wallett v. Pa. Turnpike Comm'n*, No. 10-2092, 2011 WL 864405, at *5 (M.D. Pa. Mar. 10, 2011). Wallett argues that the Defendants' pay-to-play scheme violated the Commonwealth Procurement Code, which provides for honesty and integrity by government officials in the hiring of outside contractors. *See* 62 Pa. Cons. Stat. Ann. § 2301, *et seq.*

10

We agree with the District Court that there is no clear mandate of public policy that has been violated here. We are not aware of any Pennsylvania case law in which violation of the Commonwealth Procurement Code provided the basis for an exception to the at-will employment doctrine. Additionally, even if there were a case on point, there is scant evidence in this record to support a finding that Defendants' conduct violated the Commonwealth Procurement Code. Therefore, we will affirm the District Court's dismissal of Wallett's public policy claim.

### III. Conclusion

For the foregoing reasons, we will affirm the judgments of the District Court.