## SECURITIES AND EXCHANGE COMMISSION

v.

### The INFINITY GROUP COMPANY, et al.

**Civil Action No. 97–5458.**

United States District Court, E.D. Pennsylvania.

Feb. 6, 1998.

Kingdon Kase, C. Annette Kelton, Michael Novakovic, Philadelphia, PA, for S.E.C.

Klehr, Harrison, Harvey Branzburg & Ellers by Richard A. Levan, Philadelphia, PA, for Geoffrey P. Benson.

Saul, Ewing, Remick & Saul by James M. Becker, Philadelphia, PA, for Geoffrey J. O'Connor.

Montgomery, McCracken, Walker & Rhoads by Richard L. Scheff, Philadelphia, PA, for Futures Holding Co.

Lindsey Springer, Tulsa, OK, pro se.

Dilworth, Paxson by J. Bradford McIlvain, Philadelphia, PA, for Robert F. Sanville.

### MEMORANDUM

DALZELL, District Judge.

Together with our Memorandum issued yesterday, this will constitute our findings of fact and conclusions of law in this nonjury action under Fed.R.Civ.P. 52(a). We concluded a four-day Final Injunction hearing yesterday.

As set forth in our Memorandum and Order yesterday denying defendants' suggestion of lack of subject matter jurisdiction, we have jurisdiction over the subject matter of this proceeding pursuant to Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(1).

The numbers in this case demonstrate why Congress adopted the 1933 and 1934 Securities Acts. Through the Account of Mr. Robert Sanville, the very able Trustee of The Infinity Group Company ("TIGC"), we have learned that TIGC raised over $26.6 million

from more than 10,000 investors nationwide, $24,597,386.29 of which (we have calculated) TIGC raised through an "Asset Enhancement Program" which began in September of 1996 that is the subject of this SEC enforcement action.

What happened to this money? Only $11,863,424.01—or· approximately 48% of the total received from investors—went to anything that might be characterized as an investment. From that $11.8 million in putative investments, the evidence is uncontroverted that TIGC earned not one cent of interest, dividend, or return of any kind. Indeed, shortly after TIGC began what might pass as an investment program, its investments began defaulting at the rate of nearly three-quarters of a million dollars a month. It now appears likely that the Trustee will be unable to recover even the principal on these so-called investments, many of which are now frozen or shut down by federal law enforcement authorities.

TIGC also used over $2 million in so-called downline commissions to keep the engine of this enterprise humming like a new Mercedes on the autobahn.[1] In the time-dishonored tradition of Charles Ponzi, TIGC substituted new investors' money for real investment return on old investors' funds.

The rest of TIGC's expenditures were even less investment-related. More than $816,000 was spent on real estate, a significant portion of which went to the purchase and development of a personal residence for Geoffrey and Susan Benson. The Bensons also appear to have furnished and maintained their new house at TIGC's expense: $55,511.10 went to the purchase or·lease of cars for their garage, including a new Ford Explorer for the Bensons' son; a $6,133.46 spending spree at Circuit City; more than $2,000 spent at television retailers; over $50,000 in "household expenses"; $5,000 to pay off a home mortgage; $10,000 to pay off personal credit card bills; $10,000 for school tuition for the Bensons' son; as well as hundreds for jewelry, bowling equipment and membership fees, groceries. In short, the Bensons used TIGC as their personal checking account.

In addition, Geoffrey Benson made an undisclosed donation of $1.265 million of investor funds to Lindsey K. Springer, d/b/a Bondage Breaker Ministries.

In addition to all this, defendants Geoffrey Benson and Geoffrey O'Connor paid themselves nearly $300,000 in cash from TIGC's funds, none of it reported to the Internal Revenue Service or even documented on TIGC's books—which did not exist. Lastly, more than $1.9 million remains unaccounted for, due partly to the incomplete and irregular records defendants kept, and partly, we infer, from defendants' and relief defendants' lack of cooperation in the Trustee's tireless accounting efforts.

The parties, of course, differ over the legal consequences of this financial train wreck. Defendants argue that, whatever the ultimate consequences of their actions are, they do not include answering to the SEC in this forum. We disagree. Undoubtedly TIGC's members had faith in TIGC. They certainly had hope that its extravagant guarantees would be fulfilled. But TIGC was no charity—investors were defrauded for defendants' and relief defendants' personal gain. For that, defendants must answer under the securities laws.

By Memorandum and Order yesterday, we found that TIGC's investment offerings were securities·as defined by the Securities Act of 1933 and Securities Exchange Act of 1934. Thus, we move to the substantive securities violations charged in the complaint.

█ The SEC first claims that defendants TIGC, Geoffrey Benson, and O'Connor violated sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e, by using the means or instrumentalities of interstate commerce to solicit, sell, and convey their investment contracts. In order to establish a violation of section 5, the Commission must show that: (1) no registration statement was in effect as to the security; (2) defendants offered to sell or sold the security; and (3) defendants used the means of interstate commerce in connec-

---

**1.** We refer to the 1997 Mercedes 420 E relief defendant Lindsay Springer bought with $50,000 of the funds TIGC gave him as "Bondage Breaker Ministries."

tion with the offer or sale. *See SEC v. Spence & Green Chemical Co.,* 612 F.2d 896, 901 (5th Cir.1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981); *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155 (5th Cir.1972). Once the Commission has made this showing, the burden shifts to defendants to demonstrate that the securities were exempt from the registration requirement. *See SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953).

The defendants admit that they did not file any such registration statement. Nor do they dispute the evidence of record which shows that (a) they mailed and faxed a blizzard of materials—personally signed, at various times, by O'Connor and Geoffrey Benson—soliciting investment contracts/capital units from potential investors, and (b) they received checks and other valuable assets that several thousand investors from all over the country mailed to them. Thus, the burden is on defendants to demonstrate that their securities offering was exempt from registration pursuant to Section 4 of the 1933 Act, 15 U.S.C. § 77d. Given the size of TIGC's offering (nearly $24.6 million), as well as its scope (more than 10,000 investors nationwide and abroad), and the means of offering—a fax on demand line, voluminous mailings of marketing materials, a website linked to TIGC's offices, a nationwide network of telephone operators[2] and a proselytization program that rewarded TIGC members for snaring new investors—we have no difficulty finding that this was a public offering by TIGC as issuer which is not exempted from registration. Thus, we find that defendants TIGC, Geoffrey Benson, and O'Connor each directly violated Section 5 of the Securities Act of 1933.

■ We now consider whether defendants TIGC, Geoffrey Benson, and O'Connor violated the antifraud provisions of the securities laws found in section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5 thereunder. In order to establish a violation of these antifraud provisions, the Commission must show that defendants (1) used interstate commerce, (2) made material false and misleading statements or omissions, (3) in connection with the offer, purchase, or sale of securities, and (4) with scienter. *See Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980). Although we think the astonishing and instant response to the asset enhancement program by itself demonstrates reliance by thousands of victims, actual reliance by investors is not a necessary statutory element under either section 17 or 10b. *N. Sims Organ & Co. v. SEC,* 293 F.2d 78 (2d Cir.1961), *cert. denied,* 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962). We shall address each element in turn.

As discussed before, the Commission has satisfied element one of *Aaron,* that is, the use of the means and instrumentalities of interstate commerce.

As to whether defendants made material false and misleading statements or omissions in communicating with prospective investors, a misrepresentation is material under the securities laws if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to purchase or sell securities. *See, e.g., Staffin v. Greenberg,* 672 F.2d 1196, 1204–05 (3d Cir. 1982). The Commission has more than carried its burden here. Borrowing in equal parts from the scripts of *Wall Street, Conspiracy Theory,* and perhaps even *The Apostle,* defendants claimed special access to a rarefied financial world of high-yield/low-risk investments. For example:

● "If you know someone who is highly sophisticated in international finance, and Western European banking structures, you just may want to ask that person for some details. These programs are very real, and very lucrative, but not too many people in the USA are

---

**2.** Page 17 of the "Financial Resources Special Report" that is part of P–499, for example, invites investors to "call any of our *Professional Management* team Members today", and lists individuals, and their phone numbers, in New

York, Wisconsin, Nevada, Kansas, Texas, and Puerto Rico. This statement also lists Geoffrey O'Connor and three others, and gives their Ohio telephone and fax numbers.

privy to them [*sic*] Even though there are a handful of U.S. banks that participate, they do not advertise, especially to their employees. These "trading" programs are run by a very tight knit inner circle that requires an invitation by the right person and a large amount of cash, for you to get even a hint of what is transpiring." [3]

- "Over the past several years I have been researching the banking and investment industry. Along the way, We have had the good fortune to become associated with some wonderful people. **What we have learned from these people has literally changed my way of life forever.** We learned all about "the system" and how "big business" controls the money. And how it is almost impossible for the "little guy" to do anything more than exist. I also learned that making 5% to 10% on my money was a waste of time and energy."

"**Now, we (the Trust) earn high yields annually on every dollar that we invest.** And these are guaranteed returns ... Where the principal is secured. The real important thing here is: We have locked in, **unlimited dollar amounts,** that we can invest with these guarantees. This is exactly what your bank does ... But it is very likely that they will never tell you these things. **The banks and stock brokers are making a fortune using your money." [4]**

Virtually every material statement TIGC made was false. To take just a few examples:

- There is no evidence that TIGC had a Dun & Bradstreet rating, as stated at least four times in their solicitation materials.
- There is no evidence that all of TIGC's funds "are guaranteed, [*sic*] by one of the largest banks in the world," as stated in Geoff O'Connor's January 30, 1997 letter to a prospective investor (P–503),

or "guaranteed by a top 100 World Bank" as stated in a Geoff Benson epistle general for TIGC.[5]

- There is no evidence that TIGC had "established investment credit lines of over $700,000,000 with top world banks," as stated on page four in the "TIGC Private Member Material and Manual," ex. 499.
- TIGC's representation in "Financial Resources" vol. 3, issue 8, that their "lead attorney" was Lindsey Springer is categorically false.
- TIGC's materials represent that the company invests in "prime bank instruments", which "do not exist," *SEC v. Lauer,* 52 F.3d 667, 670 (7th Cir.1995). To the contrary, according to the unrebutted testimony of Prof. Byrne, the Commission's expert on international banking instruments and investments, references to such bogus instruments is widely considered to be a red flag of securities fraud.
- Perhaps most importantly, TIGC's *guarantee* of 138% to 181% annual returns on investment, with zero risk, which appears on nearly every page of its materials, was absolutely untrue. P–499, *passim.*

Defendants dispute that they misrepresented that the principal and return of their investments were 100% guaranteed with zero risk, pointing to the few statements in their materials that purport to disclose that "there is the element of risk" in their investments. But even in making those statements, TIGC talked out of both sides of its mouth:

- "1.) **There is a risk.** Anytime you give your money to a bank, stock broker, investment counselor, your money is at risk. As a matter of fact, if you keep your money under your mattress, it is at risk. The Trust does invest in Private Placement Programs where the principal amount is secure, and we do guarantee

---

**3.** P–499 "Financial Resources Special Report", vol. 3, p. 1 (this page is headed "Too good to be true?").

**4.** *Id.,* No. 1, p. 2 (page headed "Your Success is Guaranteed ... 100%") (bolding in original).

**5.** P–499, TIGC "Member Manual and Materials", tenth unnumbered page (page headed, "By Invitation only ... The Infinity Group of Companies ...").

the return. But do not confuse these guarantees with no risk." [6]

Congress did not intend that those charged with securities fraud could be exonerated by elaborate double speak like this. Even if we were, however, to consider defendants' so-called disclosures of risk, we find the disclosures defendants cite to be inexcusably diluted and thus inadequate. Exactly what types of risk does TIGC mean to warn of?

- "... please do not interpret guarantee as meaning absolutely no risk. There is no such thing. There's a risk in getting out of bed in the morning. Or ... a big rock could fall on Ohio and wipe out TIGC and everything else in the state." [7]

Given TIGC's actual investment activities, these half-hearted disclaimers—such as they are, buried in mounds of no-risk language—fall well short of curing TIGC's pie-in-the-sky guarantees.

TIGC's material omissions, which we may also consider under section 17 of the 1933 Act and 10b of the 1934 Act, are just as damning as TICG's affirmative misrepresentations. Among the legion of material facts which TIGC failed to disclose in describing their investments was: (1) the fact all of that the investments they made were, in fact, unsecured and unguaranteed; (2) the reality of accumulating defaults, or outright failures, of numerous major investments, such as the $4.5 million default of the Amberley Group, and the $725,000 monthly accumulating default of First Equity Resources; (3) TIGC's use of investor funds, and not profit, to cover obligations to its members; (4) TIGC's diversions of investor funds to non-investment entities, such as Lindsey Springer d/b/a Bondage Breaker Ministries, and paying personal expenses for, and exorbitant "salaries" to, defendants, and so on and so on. TIGC's materials abound with such material misstatements and nondisclosures.

Element three of the antifraud provisions under *Aaron* is also easily satisfied. A cursory review of TIGC's literature reveals that its predominate purpose was to peddle defendants' fantasy securities. In addition, every

investor who testified at the hearing stated that they reviewed TIGC's materials and relied on them in making investment with the company. Even Geoffrey Benson's sole witness, Linda Christian, herself testified that she waited to receive her membership materials before deciding whether to invest her money in The Infinity Group. Thus, we find that defendants' material misstatements and omissions were without question made in connection with the offer and sale of securities.

Lastly, we turn to defendants' scienter. Our Court of Appeals has held that the required *mens rea* under section 17 of the 1933 Act and section 10b of the 1934 Act includes recklessness. *See Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir.1977)(*per curiam*), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978). "[R]eckless conduct may be defined as ... highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 193 (3d Cir.1981)(quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)). In closing argument, defendants Geoffrey Benson and O'Connor seem to acknowledge that their conduct was negligent, perhaps even grossly or inexcusably so, but ask us to stop just short of finding that they acted recklessly with the investor funds entrusted to them.

Defendants' actions were, at the barest minimum, squarely within the definition of recklessness. First, defendants used TIGC's accounts as their own personal slush fund, spending hundreds of thousands—perhaps millions—for their own personal benefit. To say the least, in accountant's parlance, these were non-performing assets. Second, defendants performed no meaningful due diligence for the money they actually did invest. They requested no financial statements—certified or otherwise—did not inquire whether the

---

6. P–499, "Financial Resources Special Report", Vol. 3, p. 2 (page headed, "What you should know before you decide").

7. *Id.*, p. 4 (page headed, "Introduction").

investments were backed by bank guarantees or otherwise insured, sought no opinions of counsel, obtained no good standing certificates, no third-party financial analysis, made no Dun & Bradstreet inquiry. In short, defendants invested on a flyer and a phone call.

A colorful example of defendants' deficient investment judgment was the Marietta & Northern Georgia Railway Bond TIGC purchased for $302,000. Apparently, it was of no moment to defendants that: (a) the bond was issued in 1889; (b) the face value of the bond was $1,000; (c) the railroad had been out of business for almost a century; or (d) they could readily have taken the bond to a historical securities analyst, like the Commission's expert, Edward Borer, who would have valued the bond at around $100. We suspect that even a complete neophyte in finance, accounting, or economics would suspect, when confronted with such an investment, that defendants' business was on the wrong track. Instead, TIGC chose in its materials to value the ancient bond at $107 million!

■ O'Connor seeks to distance himself from his co-defendants' financial misadventures by arguing that he was essentially an employee of TIGC, and had no knowledge that the statements contained in TIGC's securities offering materials were fraudulent. We decline, however, to accept his empty-vessel defense. In light of (1) the many documents which expressly state that he is a trustee of TIGC, (2) the evidence that he personally authorized the wire transfer of a half-million dollar block of TIGC funds for investment purposes, and (3) his central role in TIGC's member referral, or "downline" program—the very engine of this scheme which forestalled its collapse at the cost of millions in new investor contributions—we think that there is ample evidence which shows that O'Connor was no unwitting dupe of TIGC, but knew exactly what he was going: defrauding thousands of people.

Likewise, we reject Geoffrey Benson's proffered defense that he was ignorant of the falsity of TIGC's statements, and in all events he acted in good faith in soliciting investor funds and pursuing investments on behalf of TIGC. Even assuming that those statements are true—and we do not, given the mountain of evidence of invidious motive here—ignorance provides no defense to recklessness where a reasonable investigation would have revealed the truth to the defendant. *See United States v. Henderson,* 446 F.2d 960, 966 (8th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); *United States v. Schaefer,* 299 F.2d 625, 629 (7th Cir.), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962); *Stone v. United States,* 113 F.2d 70, 75 (6th Cir.1940). Similarly, good faith is no shield to liability under the antifraud provisions of the Securities Acts. *Greenhill v. United States,* 298 F.2d 405 (5th Cir.), *cert. denied,* 371 U.S. 830, 83 S.Ct. 25, 9 L.Ed.2d 67 (1962); *Frank v. United States,* 220 F.2d 559, 564 (10th Cir. 1955); *United States v. Oldenburg,* 135 F.2d 616, 617 (7th Cir.1943).

But we need not rely on either the ignorance defense, or the existence of recklessness, in Geoffrey Benson's case. His actual intent to defraud may be inferred from his wholly successful, and carefully-crafted, offering materials. As Professor Byrne mentioned in his testimony, the materials at length depict a mysterious cabal into which only the initiated, like TIGC's trustees, could enter. Benson's texts weave visions of risk-free, high-return investing in a clever tapestry of anti-government, individualist fervor. Although the offering materials often speak of mysteries and the need to maintain secrecy, in fact Geoffrey Benson and his colleagues well knew that the reason these secrets were not mentioned is because there were none. As Geoffrey Benson and O'Connor allowed their offering materials to be disseminated around the country—by fax on demand, through a legion of downline representatives, and via the mails—they had to know that they were funding payments to early investors with new investors' money rather than with investment return. In short, Geoffrey Benson and Geoffrey O'Connor knew precisely what they were doing in these materials, and that was engaging in a hugely successful interstate fraud.

At best, defendants' investment enterprise began as a reckless financial enterprise, and evolved into an intentional scheme to defraud

investors of their money when that money became necessary to prevent TIGC's collapse. At worst, TIGC's Asset Enhancement Program was from its inception a Ponzi scheme, calculated to bilk investors of funds by preying on their excessive greed, their feelings of exclusion from America's current prosperity, and their fears of jackbooted government intrusion. Under either scenario, the conduct of defendants' TIGC, Geoffrey Benson, and O'Connor violates § 17 of the 1933 Act and § 10b of the 1934 Act. Therefore, we hold each to be jointly and severally liable for disgorgement of the full amount of their ill-gotten gains.

■ We also find that unless enjoined—indeed, perhaps in spite of being enjoined, in light of their apparent lack of compliance with our preliminary injunction—defendants will continue to violate Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 thereunder. Defendants have to date operated under the apparent assumption that their beliefs in the illegitimacy of federal and state government grant them *carte blanche* to pick and choose which of our laws to heed. We make clear, however, that contrary to their protestation, they must heed federal securities laws that Congress adopted and whose constitutionality the Supreme Court has never questioned. Accordingly, we will enjoin defendants from further violation under the securities laws, as TIGC or under any other guise.

As to relief defendants, it is axiomatic that we may impose equitable relief on a third party against whom no wrongdoing is alleged if it is established that the third party possesses illegally-obtained profits but has no legitimate claim to them. *SEC v. Cherif,* 933 F.2d 403, 414 n. 11 (7th Cir.1991). We have jurisdiction "to decide the legitimacy of ownership claims made by [third-parties] to assets alleged to be proceeds from securities laws violations." *Id.* citing *Tcherepnin v. Franz,* 485 F.2d 1251 (7th Cir.1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); *SEC v. Wencke,* 783 F.2d 829 (9th Cir.), *cert. denied* 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986).

Relief defendant Lindsey K. Springer d/b/a Bondage Breaker Ministries admits that he received $1.265 million of TIGC's unlawfully-obtained investor funds, for which he received no consideration at all and to which he has no legitimate claim. Accordingly, we will order him to disgorge those funds.

From September 1996 until August 1997, relief defendants Futures Holding Company received $1,425,900, SLB Charitable Trust received $2,488,515.94, and JGS Trust received $125,000 from TIGC. Susan L. Benson, in her capacity as trustee of these trusts, alleges that she rendered consideration in the form of administrative and clerical services to TIGC, although she has neither testified nor produced evidence which affirmatively demonstrates that she did any work for TIGC. Moreover, to the extent that Susan Benson earned any of the funds which were transferred into these trusts, she did so in the service of the very unlawful offering and sale of securities which is the subject of these proceedings. It would be contrary to the securities law to allow Mrs. Benson to launder the proceeds of a securities fraud by billing bilked investors for services rendered in furtherance of that fraud. Illegal consideration is invalid consideration and thus cannot shield ill-gotten gains from disgorgement.

■ Finally, although we think that the record evidence alone is amply damning of defendants' conduct under the 1933 and 1934 Securities Acts, we note that defendants Geoffrey O'Connor and Geoffrey Benson, as well as relief defendant Susan Benson, exercised their Fifth Amendment right against self-incrimination as to all of TIGC's activities, which profoundly hinders our ability to determine the true nature of TIGC's operations. "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them...." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *see also Rad Serv., Inc. v. Aetna Cas. & Sur. Co.,* 808 F.2d 271 (3d Cir.1986). Thus, to the extent that we have any doubts—and we harbor none—as to whether a massive securities fraud took place here, whether and to what extent defendants

participated in it, and whether defendants and relief defendant Susan Benson improperly benefitted therefrom—we resolve those doubts against defendants and relief defendant Susan Benson.

We file our Final Injunction separately.