SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Thomas Edward CAVANAGH, U.S. Milestone, and William N. Levy, Defendant–Appellants,

Karen Cavanagh, Cromlix, LLC, and Tamar Lehmann, Relief–Defendant–Appellants,

Electro–Optical Systems, Corp., George Chachas, Thomas R. Brooksbank, Optimum Fund, Agira Trading, Ltd., Customer Safety, S.L., Cambiarios, S.L., Construcciones, S.L., Thomas A. Hantges, Cosimo Tacopino, Defendants,

Donald & Co. Securities Inc., SHBL Associates Europe Ltd., Joseph Falco, Martin Hodas, Bernd Stieghorst, Erin Martin, Anthony S. Luttenberger, Ana P. Lopez, Metropolitan Trade Finance Ltd., Tim Timlin, Carmillo Monastra, Eugene Stricker, Arthur De Acutis, Jean–Pierre Neuhaus, Kenneth C. Kehoe, and Antonio V. Borotto, Relief–Defendants.

Nos. 2629, 2630 and 2631, Dockets 98–6111, 98–6119 and 98–6129.

United States Court of Appeals, Second Circuit.

Argued July 17, 1998.

Decided Sept. 2, 1998.

130

Melinda Hardy, Securities & Exchange Commission, New York City (Larry P. Ellsworth, General Counsel, Paul Gonson, Richard M. Humes, Philip J. Holmes, Tracy M. McGowan, Securities & Exchange Commission, Washington, DC), for appellee.

Charles J. Hecht, Hecht & Steckman, New York City, for appellant Levy.

Diana D. Parker, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for appellant Lehmann.

Before: CABRANES, POOLER and REAVLEY,* Circuit Judges.

REAVLEY, Circuit Judge:

The Securities and Exchange Commission brought this enforcement action against multiple defendants for violations of the registration and antifraud provisions of the federal securities laws.[1] The SEC also named several relief defendants in the complaint and sought disgorgement of the stock at issue

---

* Honorable Thomas M. Reavley of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The SEC alleged that the defendants violated Sections 5 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e & 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

and all proceeds from sales of that stock. After a six day hearing, the district court entered a preliminary injunction in favor of the SEC.[2] William Levy, Tamar Lehmann, Thomas Cavanagh, Karen Cavanagh, U.S. Milestone, and Cromlix, L.L.C. For the reasons discussed below, we affirm.

## BACKGROUND

Based on evidence introduced at the preliminary injunction hearing, the district court made the following findings of fact, which (except where otherwise noted) are effectively uncontested for purposes of this appeal. WTS Transnational, Inc., a Massachusetts corporation in the process of developing and producing a security fingerprint system, needed financing to continue. As of September 30, 1997, WTS had $10,000 in assets, $655,000 in current liabilities and no revenues. It had yet to produce or test a prototype of its unpatented fingerprint verification system.

Thomas Cavanagh is an investment banker who runs U.S. Milestone, an investment banking company specializing in Regulation S offerings. Levy, a New Jersey securities lawyer, is Milestone's legal counsel. Cavanagh and Levy agreed to work out financing for WTS. They located a shell corporation, Curbstone Acquisition Corp., which had registered 3,500,000 shares with the SEC and had essentially no assets. Curbstone's principals—including George Chachas—registered the 3,500,000 shares pursuant to an S–8 registration statement, which is used to register securities offered to directors of a corporation, employees, and consultants.[3] Chachas was an officer, director, and major shareholder of Curbstone. Chachas and three others owned approximately 97% of the shares in Curbstone, which shares are hereafter referred to as the management shares. Levy, Cavanagh, and Chachas worked out a reverse stock acquisition, whereby Curbstone

78j(b); and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1997).

2. *SEC v. Cavanagh*, 1 F.Supp.2d 337 (S.D.N.Y. 1998).

3. Fed. Sec. L. Rep. (CCH), Instruction A to Form S–8.

would acquire WTS, and WTS's management would replace Curbstone's. The resulting entity was to be named Electro–Optical Systems Corporation (EOSC).

On December 8, 1997, WTS and Curbstone signed the Acquisition Agreement. The agreement provided for a closing on or prior to January 16, 1998. In late December 1997, Chachas, Levy, and Cavanagh arranged for the sale of Curbstone shares to third parties, with the actual sales to be made after the closing on the Acquisition Agreement. Chachas submitted a letter of resignation from his position as officer and director with Curbstone on December 12, after the Acquisition Agreement was executed, but before the transaction closed; Chachas and Thomas Brooksbank, acting as Curbstone's board, accepted their own resignations on December 18, 1997. The SEC alleges that, after the acquisition closed on December 18, Cavanagh and Chachas drove up the price of EOSC shares by purchasing small lots at high prices, issuing false and misleading press releases about WTS, and controlling the supply of EOSC shares through the third parties to which the management shares had been sold. Cavanagh also distributed hundreds of thousands of shares to friends, relatives and associates, often without consideration. Tamar Lehmann's husband, who introduced Cavanagh to WTS's management, was one of these people; he directed that the shares be deposited in his wife's account.

The district court found that the SEC established a substantial likelihood of success in proving that Levy—along with the other defendants—violated Section 5 of the Securities Act of 1933 by selling and offering to sell unregistered securities. Because the court also found that the SEC demonstrated a substantial likelihood of proving that Levy was likely to violate the registration require-

ment in the future, the court enjoined him from future violations of Section 5. In addition, the court entered an order freezing Levy's assets to the extent of all proceeds received from the sale of EOSC shares. The court also found a substantial likelihood that several defendants other than Levy violated the anti-fraud provisions of the securities laws. As to Lehmann, because the SEC established a substantial likelihood of demonstrating that she had no legitimate entitlement to the proceeds of the shares given to her by her husband, the court granted a freeze order covering those proceeds.

## DISCUSSION

 This court reviews a grant of a preliminary injunction for abuse of discretion.[4] A preliminary injunction will be upheld unless the issuing court "[a]ppl[ies] legal standards incorrectly or rel[ies] upon clearly erroneous findings of fact."[5] A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition.[6] An asset freeze requires a lesser showing; the SEC must establish only that it is likely to succeed on the merits.[7] Unlike a private litigant, the SEC need not show risk of irreparable injury.[8]

### A. William Levy

Levy appeals from the portion of the preliminary injunction enjoining him from future violations of the registration requirements of Section 5 of the Securities Act of 1933.[9] Section 5 provides that it is unlawful for any person to use the channels of interstate commerce to sell a security "[u]nless a registration statement is in effect as to [such] security," or to offer to sell or offer to buy a security "unless a registration statement has

---

**4.** *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992).

**5.** *Id.*

**6.** *SEC v. Unifund SAL,* 910 F.2d 1028, 1039–40 (2d Cir.1990).

**7.** *Id.* at 1041.

**8.** *Id.* at 1036.

**9.** Thomas Cavanagh and Milestone also were enjoined from future violations of Section 5, as well as from future violations of Sections 17(a) and 10(b) of the Securities Exchange Act of 1934. They join in Levy's arguments on appeal, but have not filed appellate briefs of their own. Accordingly, we focus our attention on the district court's injunction as it applies to Levy.

been filed as to such security." [10] Once the SEC has made a prima facie case, the burden shifts to the defendant to show that the securities were exempt from the registration requirement.[11]

### 1. Registration of Securities

 Before the acquisition, four controlling persons, including Chachas, held nearly all of Curbstone's outstanding 3.5 million shares, which had been issued to them in 1996 pursuant to a Form S–8 employee benefit plan registration. Levy argues that the SEC did not present a prima facie case that the sale in December 1997 violated Section 5 because the Curbstone shares had been registered on the S–8 form in 1996. Levy contends that once a registration statement is filed for any sale of a security, subsequent sales of that security do not need to be registered.

 Levy does not cite any legal authority to support his argument, which contradicts the long-standing reading of Section 5. A registration statement permits an issuer, or other persons, to make only the offers and sales described in the registration statement.[12] As two commentators stated:

> [I]t is really the offering or sale of the particular security that is registered and not the security itself—that is, once a security has been sold pursuant to a registration statement, subsequent sales are not themselves sales for which a registration statement is in effect. Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption.[13]

Although the language of Section 5 standing alone does not clearly indicate whether a registration statement must be filed for each offering of a security, other portions of the Act, regulations and the SEC's interpretive statements overwhelmingly support the SEC's position in this case. For example, Section 4 provides exceptions to the registration requirement of Section 5 for specific transactions,[14] indicating that registration of a security is transaction-specific.

Moreover, the regulations for registering securities specifically provide that a registration statement and any post-effective amendments will "become effective upon filing with the Commission if: (1) The registration statement is for registering additional securities of the same class(es) as were included in an earlier registration statement *for the same offering.*" [15] This language indicates that registration statements are filed for offerings and not for securities. Similarly, the regulations allow for "delayed or continuous offering and sale of securities" if certain requirements are met.[16] The logical conclusion is that registration is normally for a single, defined offering of securities. The instructions to the Form S–8 registration statement advise all potential registrants that the registration statement does not apply to resales of the securities previously sold pursuant to the registration statement.[17] This understanding is reflected in multiple cases which focus on whether the defendant was a "control person," while taking for granted that the securities would have to be re-registered if that were the case.[18] Thus, the Curbstone

---

**10.** 15 U.S.C. §§ 77e(a), (c) (1997).

**11.** *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *SEC v. Infinity Group Co.*, 993 F.Supp. 324, 326–27 (E.D.Pa.1998).

**12.** *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir.1990).

**13.** Eddy J. Rogers, Jr. & Jason Weeden, *Resales of Securities Under the Securities Act*, 1012 PLI/ Corp. 285, 287 (Sept.1997). *See also* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 353–54 (3d ed.1995) (explaining that "though in form an issuer registers its *securities,* in substance it registers *offerings*—or more pre-

cisely, perhaps, securities *with respect* to specified offerings").

**14.** 15 U.S.C. § 77d (1997).

**15.** 17 C.F.R. § 230.462(b)(1) (1998) (emphasis added).

**16.** 17 C.F.R. § 230.415.

**17.** Fed. Sec. L. Rep. (CCH) ¶ 7198, Instruction C.1 & note 2.

**18.** *See, e.g., United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir.1976) (noting that the registration statement had expired after approximately 3 months and that the defendant would have had

shares were not "registered" for all purposes under Section 5.

### 2. Unavailability of Exemption from Registration

Section 4(1) provides an exemption from the registration requirement of Section 5 for those who are not underwriters, issuers or dealers. A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities.[19] Thus, an affiliate ordinarily[20] may not rely upon the Section 4(1) exemption—he must either re-register his shares or qualify for a different exemption[21] before undertaking to sell them. Where shares are originally issued pursuant to a Form S-8 registration statement, the registration requirement may be met under certain conditions by distribution of a reoffer prospectus.[22] It is undisputed that no subsequent registration or reoffer prospectus was filed for the December 1997 offer and sale of Curbstone/EOSC stock.

▪ The district court found that Levy participated in an offer to sell the Curbstone shares that violated Section 5(c) because he was an active participant in an offer to sell

the shares while Chachas was still in control of Curbstone.[23] On December 1, 1997, Levy and Chachas started to exchange documents outlining both the acquisition and the sale of the shares to third parties, three Spanish clients of Milestone. Levy admitted at the preliminary injunction hearing that he and Chachas were discussing the terms of the sale of the stock at that stage. By December 7, 1997, Chachas had drafted and sent to Levy the purchase agreements for the management shares. On December 12, Levy sent Chachas a wire transfer payment of $550,000, which included $100,000 for the majority of the management shares and $450,000 for the option to purchase 150,000 additional management shares at $3 per share, which funds Levy contends were to be held in escrow until the closing of the WTS–Curbstone acquisition.

During the first twelve days of December, while Levy and Chachas negotiated and finalized the terms for the sale of the management shares, Chachas, even under Levy's version of the facts, remained an affiliate and in control of Curbstone. Chachas and Brooksbank, acting on behalf of Curbstone, did not accept their own resignations until December 18, 1997.

to re-register the securities, if he were a "control person"); *United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir.1968) (proceeding based on the assumption that a controlling person would have to re-register a stock before distributing it to the public). These cases do not control on the issue of whether a new registration must be filed for each offering. However, they reflect the common understanding in the courts that registration statements do not apply to future sales of the same security in the absence of an applicable exception. *See also Allison v. Ticor Title Ins. Co.,* 907 F.2d 645, 648 (7th Cir.1990) ("Section 5 (the registration requirement) applies to transactions; each sale must be registered or exempt.").

**19.** *Wolfson,* 405 F.2d at 782. The statute defines "underwriter" as:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.... As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or

controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(a)(11). This definition indicates that a sale by an affiliate that involves a distribution of securities is a transaction involving an issuer and underwriter. Levy does not contest that the December 1997 sale of the management shares constituted a distribution of securities.

**20.** The SEC has promulgated Rule 144, 17 C.F.R. § 230.144, under the terms of which an affiliate may sell limited quantities of shares within the parameters of the Section 4(1) and 4(2) exemptions. It is uncontested that the number of management shares sold here exceeded Rule 144's limits.

**21.** Levy does not attempt to invoke any other registration exemption.

**22.** Fed. Sec. L. Rep. (CCH) ¶ 7198, Instruction C.1.

**23.** The district court set out extensive findings of fact in its opinion at 1 F.Supp.2d 337, 344–59 (S.D.N.Y.1998). We will review only the highlights in this opinion.

Levy argues that these discussions and agreements did not constitute an "offer" because they were unenforceable, as the closing of the Acquisition Agreement was a condition precedent of the sale. However, the Act defines an "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."[24] This definition extends beyond the common law contract concept of an offer and clearly covers Levy's and Chachas's negotiations.[25]

Levy also argues that if the actual sale of the management shares was legal, then any offer to sell them must also be legal. He cites no legal authority for this proposition. More importantly, an offer in violation of Section 5(c) constitutes an independent offense under the securities laws.[26] Section 5(c) requires the filing of a registration statement prior to any offer, regardless of whether a sale occurs or the conditions of that sale.

Levy also argues that the district court improperly conflated Section 5 and Rule 144[27] in its analysis. Rule 144 expounds on the exemption provided under Section 4 for sale of unregistered securities by non-control persons, as well as providing for sales of limited amounts of securities by control persons without registering. The rule is a safe harbor provision that cannot be violated. The district court did not find that Levy had "violated" Rule 144; the court held that Levy had violated Section 5 and had not met the requirements to be protected by Rule 144. Levy's Rule 144 argument is simply irrelevant.

Levy also argues that he comes within the exemption for preliminary negotiations contained in Section 2(3) of the Securities Act.[28] However, the district court could reasonably find that the SEC made a sufficient showing that these negotiations had gone beyond a preliminary stage and the parties had no intention to file a registration statement.[29]

Having found that the SEC made a sufficient showing that Levy violated Section 5(c), we do not reach the issue of whether a sufficient showing was made that he participated in a sale of securities in violation of Section 5(a).

■■■■■ Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws.[30] The SEC must demonstrate that there is a substantial likelihood of future violations of illegal securities conduct.[31] The court looks at the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.[32]

The SEC made a sufficient showing that Levy was a direct participant in the offer to sell the Management Shares without re-registering them. The district court reasonably found that Levy's potential for future involvement in this type of scheme is great because he is a lawyer specializing in securities transactions. The district court also found that Levy displayed a general lack of concern for the seriousness of the charges.

---

24. 15 U.S.C. § 77b(a)(3).

25. *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir.1971).

26. *See id.* at 875–76 (legal sale following an illegal offer); David M. Brodsky & Daniel J. Kramer, *Federal Securities Litigation* 4–6 (1997) ("[E]ven where an otherwise legal sale of securities occurs, liability may be had against the defendant where that sale was preceded by an illegal offer.")

27. 17 C.F.R. § 230.144 (1998).

28. 15 U.S.C. § 77b(a)(3) (1997).

29. *See* Loss & Seligman, *supra* note 13, at 80–81 (stating that the exception in § 2(3) applies only to negotiations where an underwriter or affiliate anticipates filing a registration statement).

30. 15 U.S.C. § 78u(d).

31. *SEC v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir.1990).

32. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir.1978) (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 410 F.Supp. 1002, 1020 (S.D.N.Y.1976)).

Lastly, Levy has a history of securities law violations. In *SEC v. Management Dynamics, Inc.,*[33] this court upheld the district court's entry of an injunction against Levy prohibiting him from future violations of the registration and antifraud provisions of the federal securities laws. The district court judge noted that Levy's participation in the scheme at issue in *Management Dynamics* "bear[s] remarkable similarities" to the instant endeavor.[34] The district court was well within its discretion in entering a preliminary injunction against Levy to prevent him from committing future violations of Section 5.

**B. Tamar Lehmann**

 Lehmann, a "relief" or "nominal" defendant, appeals from the provision of the injunction that freezes, for possible disgorgement, the proceeds from the sale of the stock that were deposited in her bank account.[35] The SEC does not accuse Lehmann of any wrongdoing. Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.[36] Lehmann does not dispute that she received proceeds from the sale of EOSC stock transferred to her (on behalf of her husband) by Cavanagh, who has been enjoined for fraud in connection with those shares. Thus, the issue is whether Lehmann has a "legitimate claim" to the EOSC shares or their proceeds.

 As a threshold matter, this court reviews the district court's grant of a preliminary injunction for an abuse of discretion.[37]

The standard of review for an injunction freezing assets of a relief defendant is whether the SEC has shown that it is likely to succeed on the merits; the SEC need not make any showing that a future violation is likely, because it is not accusing the nominal defendant of any wrongdoing.[38] Lehmann argues that the SEC should have to make a "clear and substantial showing of success on the merits," citing *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*[39] However, the injunction in *Tom Doherty* required the defendant to perform a positive act— namely, to offer to the plaintiff the rights to publish a book.[40] This court has said that the court "should require a more substantial showing of likelihood of success ... whenever the relief sought is more than preservation of the status quo."[41] In this case, the injunction merely freezes the status quo.

Lehmann also argues that the SEC was required to show that there were no adequate and less burdensome measures for obtaining relief other than by freezing her accounts. In *United States v. Regan,*[42] this court required the government to make such a showing before enjoining a partnership from engaging in certain transactions and subjecting its affairs to review by a government monitor. In holding the government to such a high standard of proof, this court noted that the partnership was largely owned by innocent persons, not named in the RICO suit, and the government had no interest in the partnership beyond the defendants' individual interests.[43] In this case, the injunction does not affect property rights of someone not a party in the proceeding. Lehmann is named, if only as a relief defendant, and

**33.** 515 F.2d 801, 803 (2d Cir.1975).

**34.** *SEC v. Cavanagh,* 1 F.Supp.2d 337, 373 (S.D.N.Y.1998).

**35.** Karen Cavanagh and Cromlix LLC also were relief defendants subject to the district court's freeze on EOSC stock trading proceeds. They join in Lehmann's arguments on appeal, but have not filed appellate briefs of their own. Accordingly, we focus our attention on the injunction as it applies to Lehmann.

**36.** *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir. 1998).

**37.** *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992).

**38.** *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d Cir.1990).

**39.** 60 F.3d 27, 34–35 (2d Cir.1995).

**40.** *Id.* at 33.

**41.** *Unifund SAL,* 910 F.2d at 1039.

**42.** 858 F.2d 115, 121 (2d Cir.1988).

**43.** *Id.* at 120–21.

thus has full opportunity to litigate her rights. Moreover, the frozen assets are limited to the proceeds of the stock at issue, and the preliminary injunction has no effect on any assets of Lehmann's that are not the product of the alleged securities law violations. Lehmann additionally claims, citing *Hsu v. Roslyn Free School District,*[44] that a heightened standard is required because the injunction grants the SEC all the relief it could ever obtain from Lehmann. This argument rests on an incorrect premise. If the SEC prevails, it will receive the proceeds. For the time being, the proceeds are merely frozen.

The district court concluded that neither Lehmann nor her husband has a legitimate claim to the proceeds because the SEC is likely to be able to show that he gave no consideration for the EOSC shares and thus received them as a gift. The district court found that Mrs. Lehmann stands in the shoes of her husband with respect to any rights she has to the EOSC shares. Cavanagh gave the stock to Mr. Lehmann, a business associate who has now been named as a defendant to fraud charges in the SEC's amended complaint.[45] Mr. Lehmann directed that the stock be deposited in his wife's account. Mrs. Lehmann admitted under oath that, until the SEC filed this action, she did not even know she had received the stock, that the stock had been sold, or that $500,000 in proceeds had been transferred to her bank account. Allowing her to now claim valid ownership of those proceeds would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives, without even their knowledge. The district court was within its discretion in granting the preliminary injunction freezing the proceeds from the stocks.

For the foregoing reasons, the order of the district court is AFFIRMED.

---

**44.** 85 F.3d 839, 852 (2d Cir.), *cert denied,* ––– U.S. –––, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

**45.** *See SEC v. Cavanagh,* 1998 WL 440029 (S.D.N.Y. July 27, 1998).